THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARIETTA ANN GILBERT, Defendant-Appellant.
Third District   No. 3—90—0725

Opinion filed January 30, 1992.

Arden J. Lang, of State Appellate Defender's Office, of Springfield, for appellant.

Kevin W. Lyons, State's Attorney, of Peoria (John X. Breslin and Rita Kennedy Mertel, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SLATER delivered the opinion of the court:

Defendant Marietta Gilbert was charged by indictment with attempted murder, armed violence and two counts of aggravated battery. Following a jury trial the defendant was found not guilty of attempted murder and guilty of armed violence and two counts of aggravated battery. Judgment was entered on the armed violence and aggravated battery charges and defendant was sentenced to a six-year term of imprisonment for the armed violence conviction. Defendant raises the following issues on appeal: (1) whether the verdicts of the jury were logically inconsistent; (2) whether the defendant was proved guilty beyond a reasonable doubt; (3) whether the defendant was denied due process by an alleged discovery violation by the State; (4) whether defendant's counsel was ineffective; and (5) whether the trial court erred in entering judgment on the armed violence and aggravated battery charges where they arose from a single physical act. For the reasons stated below, we affirm.

The charges in this case arose out of the stabbing of Anthony Bell which occurred at Julia Rodgers' apartment in the early morning hours of October 14, 1989. John Nichols testified that he went to Rodgers' apartment sometime after 10 p.m. on October 13, 1989. When Nichols arrived, Rodgers, Vincent Edwards and Anthony Bell were present. Sometime later the defendant, who was singing and appeared to be cheerful, arrived at the apartment and talked with Rodgers and Edwards while they were preparing some food in the kitchen. The defendant and Bell then left Rodgers' apartment. Approximately 30 minutes later, the defendant returned carrying a mirror and went into the kitchen. Bell also came back to the apartment. Nichols stated that the next thing he saw was the defendant walking quickly toward the front door with Bell following behind her. Bell grabbed the defendant's arm and said that he wanted to talk to her. The defendant tried to jerk away and Bell put his arms around the defendant in a bear hug. The defendant got loose and stabbed Bell in the neck with a butcher knife. Nichols further testified that he did not hear Bell threaten the defendant nor did he see Bell strike the defendant. According to Nichols, after Bell was stabbed the defendant acted as if she were in shock. She told Bell she was sorry and acted "[a]s if she didn't know she did it." The defendant then tried to keep Bell still and stop the bleeding, saying, "Tony, please don't die."

Dr. Paul Norris testified that the knife wound suffered by Bell severed his jugular vein and almost completely cut through his left carotid artery. Due to blood loss to the brain, Bell suffered a massive stroke resulting in paralysis of the right side of his body. Norris stated that the wound was one inch long and two inches deep and, in his opinion, it was a puncture wound rather than a slash wound.

Julia Rodgers testified that she had been friends with both Bell and the defendant for a number of years. The defendant told Rodgers on October 13, 1989, that she was tired of Bell beating her up and "jumping" on her and, even though she loved Bell, she had come close to killing him. The defendant also told Rodgers that Bell had "jumped" on her that day, but Bell denied it when Rodgers asked him about it. Rodgers also stated that Bell was seeing a girl named Tamika.

Rodgers further testified that when the defendant came to her apartment in the early morning hours of October 14, 1989, she was happy and singing a song. Defendant later came into the kitchen and picked up a knife which Edwards shook out of her hand and kicked across the floor. Bell picked up the knife and put it on a kitchen

counter. Someone then knocked on the door of the apartment and asked for the defendant. Defendant went outside, and a short time later Bell also left the apartment. Bell came back to Rodgers' apartment 10 or 15 minutes later, followed shortly thereafter by defendant. Defendant was carrying a mirror and appeared to be using the mirror to aid in removing something from her eyes. According to Rodgers, defendant then began walking toward the front door of the apartment when Bell asked to talk to her. Rodgers lost sight of the defendant when she bent over to put the mirror down, but when she straightened up, defendant had a knife in her hand. Defendant made a stabbing gesture towards Bell and blood began to gush all over the floor. Rodgers further testified that she did not see Bell put defendant in a bear hug nor did she see them struggling. It was Rodgers' opinion that the defendant was not afraid of anyone, including Bell.

Vincent Edwards, Julia Rodgers' brother, testified that he was cooking in the kitchen of Rodgers' apartment when the defendant came in singing a song. Edwards later saw the defendant with a knife in her hand. He shook the knife out of defendant's hand and kicked it towards the living room, where it was picked up by Bell. Edwards did not see the defendant stab Bell. Edwards further testified that he had heard the defendant make remarks about Bell and other women, including the statement, "If I can't have him no one would have him."

Joanne Robertson, a Peoria police officer, testified in an evidence deposition that she went to Rodgers' apartment and found the defendant lying on top of Bell saying, "Baby, I'm sorry, I'm so sorry. Baby, I love you. Tony, don't die." According to Robertson, after defendant was placed in a squad car and asked what she had been doing that night, she told Robertson that she had gone to visit Bell at Rodgers' apartment and that she knew Bell was there.

Phyllis King, a friend of Anthony Bell's, testified that Bell had been seeing Tamika Edwards before the date of the stabbing. According to King, about a month prior to the stabbing the defendant stated that "if she couldn't have Tony, no one else could."

Ivan Berryhill, defendant's 12-year-old son, testified that he was awakened by the sound of doors slamming around midnight on the night of October 13, 1989. Berryhill saw Bell chasing the defendant through the apartment. Bell caught up with the defendant outside after she tripped. Bell threw sand in defendant's face. Defendant then got up and ran towards Rodgers' apartment with Bell chasing her.

Elizabeth Parker, a certified nurse and defendant's sister-in-law, testified that when defendant was brought to the Peoria County jail she appeared to be in a state of shock. Defendant had sand in her eyebrows and hair and lacerations on her face and neck, as well as a black eye. Parker was incarcerated at the jail on a conviction for deceptive practices.

Willette Johnson testified that she went to the defendant's apartment between 10 p.m. and 11 p.m. on October 13, 1989. Johnson saw Bell pushing and shoving the defendant and calling her names. The defendant told Bell to leave.

Defendant Marietta Gilbert testified that she had known Anthony Bell for about four years. Bell had physically abused her during the course of their relationship, including beating her, hitting her with sticks imbedded with nails, striking her in the mouth with a bottle, giving her black eyes and choking her until she was unconscious. Bell came to defendant's apartment between 5 p.m. and 6 p.m. on October 13, 1989. Defendant told Bell not to take her cigarettes. Bell replied that everything defendant had belonged to Bell, including her life. Bell also told Gilbert that he hated her and that she should not go outside the apartment. Bell returned around 8 p.m. and told Gilbert that he would never let her be happy with another man and that he would find a way to destroy her.

Defendant next testified that she went to Rodgers' apartment at 11:30 p.m. to ask Rodgers to accept delivery of a washing machine the next morning. Defendant stated that she was shocked to see Bell there, but she did not want to let him know she was afraid. Bell interrupted defendant while she was talking to Rodgers and threatened to "kick [her] ass." Defendant denied singing and said the initial incident involving the knife described by Rodgers and Edwards had not occurred.

After Bell threatened defendant, she ran out of Rodgers' apartment. Bell caught her before she could enter her own apartment and threw sand in her face. Defendant and Bell then entered defendant's apartment; defendant grabbed a mirror and ran back to Rodgers' apartment. Defendant removed the sand from her eyes and Bell returned to Rodgers' apartment. Defendant began crying, stating that she wished Bell would leave her alone. Walter Doolittle arrived at Rodgers' apartment, and defendant asked him to get her away from the apartment. Doolittle agreed, but defendant became frightened when Bell said something and she did not leave with Doolittle.

A short time later defendant walked towards the door. Bell threatened to hurt her if she left Rodgers' apartment. Defendant

went into the kitchen and picked up a knife. According to defendant, Bell twice more threatened to hurt the defendant when she left the apartment. Defendant walked to the door and Bell grabbed her left shoulder. Defendant turned and Bell hit her in the face with his fist. Bell then began to choke defendant and, as she tried to push him back, Bell said he was cut. Defendant tried to calm Bell and applied pressure to the wound in an attempt to stop the bleeding. Defendant stated that she did not intend to harm Bell and only wanted to get away from him. She believed Bell was going to kill her.

On cross-examination, defendant stated that the reason she did not call the police to protect herself from Bell was because he was a gang member. Defendant stated that the first time she called the police regarding Bell she was threatened by 15 or 16 gang members. Defendant denied telling Officer Robertson that she knew Bell was at Rodgers' apartment and that she went there to see him. Defendant also stated that she did not care if Bell saw other women. According to defendant, at the time Bell was injured, Rodgers and Nichols were not in the kitchen but were upstairs and could not have witnessed the stabbing. Upon further cross-examination, defendant denied telling a detective that Bell had not struck her.

Detective John Mingus of the Peoria police department testified in rebuttal that the defendant told him Bell had not struck her while they were in Rodgers' apartment. Mingus also stated that defendant did not mention anything about Bell choking her prior to the stabbing. Mingus did not notice any swelling or injury to defendant's face.

Ethel Massey, the defendant's mother, testified that she visited the defendant at the Peoria County jail on October 15, 1989. According to Massey, the defendant had black eyes and some marks around her neck.

The defendant first contends that the verdicts by the jury of not guilty of attempted murder and guilty of armed violence and aggravated battery are logically inconsistent. The defendant argues that since the jury was instructed concerning justifiable use of force, and the jury found the defendant not guilty of attempted murder, the jury must have concluded that the defendant's use of force was justified. Therefore, according to the defendant, the same justification existed with respect to the armed violence and aggravated battery charges, requiring acquittal on those charges as well.

The flaw in defendant's reasoning, however, is the assumption that the jury's not guilty verdict on the attempted murder charge was based on the belief that the defendant's use of force was justi-

fied. Obviously, the jury could have rejected defendant's claim of self-defense while nevertheless finding that the State failed to prove that defendant had the specific intent to kill Bell. As the court in *People v. Hancock* (1980), 83 Ill. App. 3d 700, 704, 404 N.E.2d 914, 917, noted in rejecting a similar argument:

> "The elements of the offenses of attempt[ed] murder and aggravated battery are different. Conviction for the crime of attempt[ed] murder requires a finding that the defendant specifically intended to kill the victim, while aggravated battery requires no specific intent. [Citation.] Thus, the jury could have properly found that the specific intent to murder was absent when they acquitted [the defendant] of attempted murder. The jury was not required to accept the theory of self-defense to reach such a verdict. In fact, their finding of guilt on the aggravated battery charges directly refutes [the defendant's] speculation. The record discloses no inconsistency, legal or logical."

■ In this case, the jury was instructed that to sustain the charges of aggravated battery and armed violence, the State was required to prove that the defendant's use of force was not justified. The guilty verdicts on these charges conclusively demonstrate that the jury rejected the defendant's claim of self-defense. The jury's verdicts were not inconsistent.

Defendant next contends that she was not proved guilty beyond a reasonable doubt. Defendant argues that the evidence showed Bell was the aggressor and the stabbing was accidental. Defendant also maintains the testimony of Julia Rodgers and Vincent Edwards was less credible than that of John Nichols because there was evidence that Edwards and Bell belonged to the same gang. Finally, defendant contends that her reaction to Bell's injury and her attempt to aid Bell demonstrated her lack of intent to stab Bell.

■ When presented with a challenge to the sufficiency of the evidence, the relevant question on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) Whether the defendant's act was justified under the law of self-defense is a determination for the trier of fact and depends upon the surrounding facts and circumstances. (*People v. Miller* (1991), 211 Ill. App. 3d 572, 570 N.E.2d 515; *People v. Hudson* (1987), 161 Ill. App. 3d 447, 514 N.E.2d 799.) The trier of fact is in the best position to determine the credibility of

the witnesses and the weight to be given to their testimony. (*People v. Locascio* (1985), 106 Ill. 2d 529, 478 N.E.2d 1358.) The jury is not required to believe the defendant's testimony (*Locascio*, 106 Ill. 2d 529, 478 N.E.2d 1358; *People v. Purdle* (1991), 212 Ill. App. 3d 594, 571 N.E.2d 178), and where the evidence is merely conflicting, a court of review will not substitute its judgment for that of the trier of fact (*Hudson*, 161 Ill. App. 3d 447, 514 N.E.2d 799).

In this case, while there was some evidence indicating that the stabbing was accidental or that the defendant was acting in self-defense, there was also considerable circumstantial evidence that the defendant may have acted out of anger or jealousy. Defendant's statements that if she could not have Bell no one would, her early unsuccessful attempt to obtain a knife, and the nature of the wound to Bell's neck suggest that the defendant's act was deliberate. Defendant's reaction after the stabbing may have been due to shock and regret at the consequences of her act. With regard to defendant's opinion of the credibility of the witnesses, that determination is the province of the trier of fact. We note, however, that while the defendant argues that the testimony of John Nichols was more credible than that of Julia Rodgers or Vincent Edwards, even Nichols' testimony was not entirely consistent with defendant's account of the incident. Nichols testified that defendant was singing when she entered Rodgers' apartment but defendant denied doing so. In addition, although defendant testified that Bell threatened her three times and punched her in the face prior to the stabbing, Nichols stated that he neither heard Bell threaten the defendant nor did he see Bell strike her. It is the jury's function to resolve conflicts in the evidence. We find that there was sufficient evidence presented to support the jury's verdict.

Defendant next contends that she was denied her right to due process by the State's failure to disclose Bell's prior criminal convictions. Defendant argues that the State was required to provide her with this exculpatory evidence by Supreme Court Rule 412 and by Federal law. (134 Ill. 2d R. 412; *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) Defendant maintains that Bell's convictions were admissible to support her theory of self-defense by demonstrating Bell's violent character. *People v. Lynch* (1984), 104 Ill. 2d 194, 470 N.E.2d 1018.

In *Lynch*, our supreme court held that when a theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may establish such character by introducing the victim's convictions for crimes

of violence. (*Lynch*, 104 Ill. 2d 194, 470 N.E.2d 1018.) The record in this case reveals that Bell was convicted of criminal damage to property in 1984, aggravated battery in 1985 (for stabbing Felicia Tidwell in the back with a knife), and unlawful delivery of cannabis (two counts) and unlawful possession with intent to deliver cannabis in 1988. Thus, under *Lynch*, only the conviction for aggravated battery would have been admissible at defendant's trial.

■ By failing to include this issue in her post-trial motion, defendant has waived any alleged error by the State's failure to disclose Bell's aggravated battery conviction. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124; *People v. Kunze* (1990), 193 Ill. App. 3d 708, 550 N.E.2d 284.) We also decline to address this issue under the plain error rule (134 Ill. 2d R. 615 (a)) for two reasons.

First, the record on appeal does not appear to contain all the discovery material provided by the State. For example, the State's answer to defendant's discovery motion repeatedly refers to "attached reports" which are not contained in the record. Also, the State's response to defendant's request for the record of prior criminal convictions of the State's intended witnesses states that this information "will be forthcoming," although such information is not located in the record. It is the appellant's responsibility to present the reviewing court with a proper record in support of claimed errors, and any doubts arising from the incompleteness of the record will be resolved against the appellant. See *People v. Turner* (1982), 110 Ill. App. 3d 519, 442 N.E.2d 637; *People v. Davis* (1982), 106 Ill. App. 3d 260, 435 N.E.2d 838; see also *People v. Velez* (1990), 204 Ill. App. 3d 318, 562 N.E.2d 247.

Second, although not at all clear, the record suggests that the State may have disclosed Bell's aggravated battery conviction, or at least that defendant may have been aware of it before trial. In response to the State's discovery request, the defendant listed 13 witnesses whom she intended to call at trial. At some point a fourteenth name, handwritten at the bottom of the list, was added. The additional name was Felicia Tidwell, the victim of the aggravated battery committed by Bell in 1985. Tidwell's inclusion on the defendant's list of witnesses indicates that there may have been no discovery violation. In any event, this court will not decide issues on the basis of surmise or conjecture.

■ Defendant's next contention is that her trial counsel was ineffective in failing to discover Bell's conviction and in failing to present such evidence at trial. As indicated above, however, we are unable to determine with any certainty whether or not defendant's

counsel was aware of Bell's aggravated battery conviction. If defense counsel did not know of Bell's conviction because of the State's failure to disclose it, we deem it unlikely that his failure to independently discover it would demonstrate ineffectiveness. (See *United States v. Agurs* (1976), 427 U.S. 97, 102 n.5, 49 L. Ed. 2d 342, 349 n.5, 96 S. Ct. 2392, 2397 n.5.) On the other hand, if counsel was aware of Bell's conviction and did not present it due to a misunderstanding of the law, his performance may have been deficient. Under the circumstances, we believe the proper response to defendant's argument was given by the court in *Kunze* (193 Ill. App. 3d at 725-26, 550 N.E.2d at 296):

> "Where, as here, consideration of matters outside of the record is required in order to adjudicate the issues presented for review, the defendant's contentions are more appropriately addressed in proceedings on a petition for post-conviction relief. (Ill. Rev. Stat. 1987, ch. 38, pars. 122—1 through 122—8.) We therefore decline to adjudicate in this direct appeal [defendant's] contentions concerning the alleged incompetence of [her] trial counsel. An adjudication of a claim of ineffective assistance of counsel is better made in proceedings on a petition for post-conviction relief, when a complete record can be made and the attorney-client privilege no longer applies."

The defendant's final contention is that the trial court erred in entering judgment on the two counts of aggravated battery where they and the conviction for armed violence were based on the same physical act of stabbing Bell. The record indicates, however, that defense counsel agreed that judgment could properly be entered on the aggravated battery charges. A defendant may not complain on appeal of a sentencing error which she invited the court to make. (*People v. Gutierrez* (1987), 156 Ill. App. 3d 555, 509 N.E.2d 787.) In addition, a claim that multiple convictions were improper can be waived by failing to raise the issue in the trial court. (*People v. Holder* (1991), 213 Ill. App. 3d 109, 571 N.E.2d 528; *People v. Schaefer* (1989), 188 Ill. App. 3d 317, 543 N.E.2d 894.) We find this issue has been waived.

For the reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

GORMAN and STOUDER, JJ., concur.