THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SCOTT W. PARKER, Defendant-Appellant.

Third District    No. 3—02—0373

Opinion filed December 5, 2003.

Fletcher P. Hamill, of State Appellate Defender's Office, of Ottawa, for appellant.

Marshall E. Douglas, State's Attorney, of Rock Island (Lawrence M. Bauer, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SLATER delivered the opinion of the court:

Defendant Scott Parker was convicted of first degree murder (720 ILCS 5/9—1 (West 2000)) in the death of Catherine Kelley and was sentenced to a 60-year term of imprisonment. Defendant was also convicted of involuntary manslaughter and residential burglary arising from the same incident. On appeal, defendant contends that: (1) the trial court erred in denying his motion to suppress; (2) his defense counsel was ineffective; (3) the trial court failed to comply with Supreme Court Rule 605(a) (Official Reports Advance Sheet No. 21 (October 17, 2001), R. 605(a) (eff. October 1, 2001)); and (4) he is entitled to an additional day of sentencing credit. We affirm and remand with directions.

## Facts

As the defendant does not challenge the sufficiency of the evidence, we will not set out a detailed recitation of the trial proceedings. We present only a brief overview of the facts; more information will be related as necessary to resolve particular issues.

On November 12, 2001, the defendant, who had previously performed maintenance work for Kelley, went to her home in Moline, Illinois. Kelley's car was in the driveway, but she did not answer her door when defendant knocked. Defendant entered the home, saw Kelley's purse on the table, and took a credit card from the purse. Defendant heard a noise in the basement and walked toward the base-

ment stairwell, where he encountered Kelley at the top of the stairs. Kelley began screaming and the defendant grabbed onto her as she ran or slipped back down the stairs. Defendant fell going down the stairs and as he got up he wrapped his arm around Kelley and held onto her "real tight" because she was screaming and yelling. Defendant then tried to tie a white piece of cloth around Kelley's mouth. He pulled it tight, tied it, and left in Kelley's car. An autopsy revealed that Kelly died from strangulation, probably by the bathrobe belt found tied around her.

Defendant subsequently used the credit card he had taken to buy power tools which he then pawned. Defendant was arrested on November 16 at a bus stop in Davenport, Iowa, by Davenport police pursuant to an arrest warrant for forgery and theft based on defendant's use of Kelley's credit card. The Davenport police informed Moline police of defendant's arrest, and two Moline detectives, Pablo Reyna and Douglas Garrison, went to Davenport to interview the defendant. Garrison informed the defendant of his *Miranda* rights and he acknowledged that he understood them. Defendant was then given a form containing the *Miranda* rights and he was asked to place his initials next to each statement on the form. Defendant began initialing the form but stopped and said "I think I need a lawyer."[1] He then said, "I didn't mean to hurt her." Reyna and Garrison then left and went to another room to interview the defendant's mother.

Approximately 10 minutes after Reyna and Garrison left, Davenport Detective Thomas entered the interview room and told the defendant that he was going to read to him the warrant that had been the basis for his arrest. According to Thomas, he was required by Iowa law to read the warrant to the defendant. Detective Brown also testified that reading the arrest warrant was an Iowa statutory requirement. After Thomas began reading the warrant, the defendant interrupted him and made some inculpatory statements. Thomas did not respond. The defendant then asked Thomas to get Officer Reyna. Thomas told Reyna and Garrison what had occurred and they went back into the interview room. After the defendant said that he now wished to speak without his lawyer being present, defendant was "re-

---

[1]Officer Garrison testified that defendant said "I think I need a lawyer," as did Davenport Detective Steven Brown, who was watching and listening on a television monitor in another room. Officer Reyna testified similarly, but he also stated on several occasions that defendant said "I *believe* I need a lawyer." On the other hand, Davenport Detective William Thomas, Jr., who was also watching on a television monitor, testified that defendant said "I think I'll wait and talk to an attorney."

Mirandized" and he signed a written waiver of his rights. Defendant subsequently gave a videotaped statement in which he admitted killing Kelley.

## Analysis

The defendant first contends that the trial court erred in denying his motion to suppress the statements he made to police after invoking his right to counsel. Specifically, defendant argues that Detective Thomas's reading of the Iowa arrest warrant constituted further interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), and *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981). We disagree.

■ *Miranda* established that a defendant subjected to custodial interrogation was entitled to certain procedural safeguards, including the right to have an attorney present during questioning. Moreover, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474, 16 L. Ed. 2d at 723, 86 S. Ct. at 1628. Once a defendant has invoked his right to counsel, he may not be subject to renewed interrogation without his attorney present, "unless the accused himself initiates further communications, exchanges, or conversations with the police." *Edwards*, 452 U.S. at 485, 68 L. Ed. 2d at 386, 101 S. Ct. at 1885.

In this case the defendant instituted a conversation with Detective Thomas and asked to speak with Officer Reyna. He did so, however, only after Thomas began reading the arrest warrant, and a defendant does not waive his right to counsel merely by responding to further police-initiated custodial interrogation. *Edwards*, 451 U.S. at 484, 68 L. Ed 2d at 386, 101 S. Ct. at 1885. The critical issue, therefore, is whether Thomas's reading of the arrest warrant constituted "interrogation."

In *Rhode Island v. Innis*, 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980), the Supreme Court held that "interrogation" for *Miranda* purposes includes not only express questioning, but also any words or actions by the police, other than those normally attendant to arrest and custody, that the police should know are reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 301, 64 L. Ed. 2d at 308, 100 S. Ct. at 1689-90. This definition focuses primarily upon the perceptions of the defendant, rather than the intent of the police. However, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Emphasis in original.) *Innis*, 446 U.S. at 301-02, 64 L. Ed. 2d at 308, 100 S. Ct. at 1690.

Should Detective Thomas have known that reading the Iowa arrest warrant to the defendant was reasonably likely to elicit an incriminating response? Thomas testified that he was required by Iowa law to read the warrant to defendant, and he did so at what he felt was the first opportunity. He described what occurred as follows:

"I entered the room and I had the warrant in my hand. I did not even sit down in the chair. *** I informed Mr. Parker that I would read to him the warrant that I had issued for his arrest. I read to him, to any peace officer in the State of Iowa[,] information upon oath having been filed this day before the Iowa District Court, Scott County, Iowa that the crime of forgery, 715A.6[,] theft fourth degree 714.2 sub-paragraph 4, theft fifth degree 714.2 subparagraph 5. After I got done reading the theft fifth [degree] charge Mr. Parker interrupted me.

Q. [Assistant States Attorney] What did he say?

A. He told me that he was a patient at the Robert Young Center for drug abuse. Informed me that he had been going there and they told him that he did not have any type of a problem. He said to me, with all that you have charged me with does that sound like I have a problem or not? I didn't acknowledge him. I didn't say anything. He then told me, thank God you guys got me when I hurt one person and not a thousand. He then asked me to send back in either said [*sic*] Detective Reyna [or] the Mexican detective. I can't recall which one he said.

Q. Now, why were you reading him that document?

A. It's required by law, Iowa law, that the arrestee is read the warrant.

Q. Whether or not Mr. Parker was a suspect in a murder investigation in Illinois would you have read that charge to him, that warrant to him, no matter whether or not he was a suspect or not?

A. I have, by law I have to read it to him regardless of anything else going on.

Q. Did you ask him any questions regarding the Moline, alleged Moline murder?

A. At no time during this incident did I ever ask Scott Parker anything about the death investigation.

Q. When you were in that room and reading him the warrant [and] he makes these statements did you say anything more to Mr. Parker?

A. No, he interrupted me.

Q. And he made these statements?

A. Yes.

Q. Then you left the room without making any further statements?

A. Yes."

As we indicated previously, Detective Brown also testified that reading the warrant was a statutory requirement. Defendant asserts, however, that Iowa law required only that he be informed of the existence of the warrant, and that it be shown to the defendant upon his request. See Iowa Code § 804.14 (2001). We agree that section 804.14 does not appear to require that an arrest warrant be read to a defendant. We note, however, that the defendant in *State v. Webb*, 516 N.W.2d 824 (Iowa 1994), argued that the arresting officers violated section 804.14 by failing to show him the warrant and failing to read it to him. The Iowa Supreme Court held that the police had substantially complied with section 804.14 by reading the warrant to defendant at the police station. It is possible that police agencies in Iowa have interpreted *Webb* as requiring the reading of an arrest warrant. We further note that Thomas at one point testified that reading the warrant was required as part of the "booking procedure" after a person had been arrested. In any event, it is not necessary to determine whether Thomas was *actually* required to read the warrant, so long as he *believed* he must do so. The officer's intent is relevant only to the extent that it bears on whether he should have known that his words or actions were reasonably likely to elicit an incriminating response. That is, "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which police should have known was reasonably likely to have that effect." *Innis*, 446 U.S. at 301 n.7, 64 L. Ed. 2d at 308 n.7, 100 S. Ct. at 1690 n.7. Conversely, where a police practice is part of a routine booking procedure, there is little reason for the officer to foresee that such conduct will evoke an incriminating response.

In *Innis*, the defendant was suspected of robbing a taxi driver with a sawed-off shotgun. After invoking his right to counsel, defendant was placed in a squad car containing three police officers for transport to the police station. While en route, one officer commented to another regarding a nearby school for handicapped children that "God forbid one of them might find a weapon with shells and they might hurt themselves." *Innis*, 446 U.S. at 294-95, 64 L. Ed. 2d at 304, 100 S. Ct. at 1686. The other officer concurred that they should try to find the weapon. The third officer said nothing, but he recalled the first officer saying that it would be too bad if a little girl picked up the gun and killed herself. The defendant interrupted the conversation and offered to show where the gun was located.

The Supreme Court held that the officers should not have known that their conversation was reasonably likely to elicit an incriminating response, stating:

"There is nothing in the record to suggest that the officers were aware that the respondent was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor is there anything in the record to suggest that the police knew that the respondent was unusually disoriented or upset at the time of his arrest.

The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly 'evocative.' " *Innis*, 446 U.S. at 302-03, 64 L. Ed. 2d at 309, 100 S. Ct. at 1691.

■ In this case there is nothing in the record to suggest that Detective Thomas had any reason to think that the defendant would react as he did to the routine procedure of reading the warrant. The language of the warrant was not evocative and the manner in which it was read—with Thomas announcing his purpose and remaining standing—was not particularly conducive to generating conversation. It does not appear that either Thomas's words or his conduct could fairly be characterized as calling for *any* response from defendant. We find that defendant's statements to Thomas were not the result of words or actions that Thomas should have known were reasonably likely to elicit an incriminating response. See *People v. Wright*, 272 Ill. App. 3d 1033, 651 N.E.2d 758 (1995) (routine information pertaining to custodial relationship does not violate *Edwards*).

## Voluntariness of Waiver

■ Our finding that Detective Thomas's reading of the Iowa arrest warrant to defendant did not constitute interrogation does not end the *Edwards* inquiry. Once a defendant invokes his right to counsel, even if he subsequently initiates a conversation and indicates a willingness and desire for a generalized discussion about the investigation, the burden remains on the State to show that defendant knowingly and intelligently waived his right to counsel. See *Oregon v. Bradshaw*, 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983); *People v. Olivera*, 164 Ill. 2d 382, 647 N.E.2d 926 (1995). In this case Officer Reyna testified that after he was told that the defendant wanted to talk to him, he and Officer Garrison met with the defendant. Reyna reminded the

defendant that he had asked for a lawyer and asked whether the defendant wanted to talk without his lawyer present. The defendant said he did, and he was re-advised of his *Miranda* rights and signed and initialed a written waiver of rights. On the videotaped statement made a few minutes later, the defendant was asked:

"Q. [Detective Reyna]: Scott, did at one time you tell us that you wanted to talk to a lawyer before you spoke to us?

A. [Defendant]: Yes.

Q. Okay. Did you change your mind of your own free will that you wanted to talk to us without a lawyer?

A. Yes.

Q. So you signed a rights waiver saying that you would talk to us without a lawyer. Correct?

A. Yes."

We find that the defendant knowingly and intelligently waived his right to counsel. The trial court did not err in denying defendant's motion to suppress.

### Ineffective Assistance of Counsel

The defendant next contends that his attorney was ineffective because he failed to call the defendant as a witness at the hearing on the motion to suppress. Contrary to Thomas's testimony that he only read the arrest warrant to the defendant, defendant testified at trial that Thomas told him that it would be to his benefit to talk to the Moline police. Defendant also stated that he was "kind of upset" that he did not get the chance to talk about it at the suppression hearing. Defendant argues that if he had testified at the hearing, there is a reasonable probability that the trial court would have granted the motion to suppress.

■ To establish that defense counsel did not provide effective assistance, defendant must prove both that his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 446 (1984). To establish that counsel was deficient, the defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *People v. Richardson*, 189 Ill. 2d 401, 727 N.E.2d 2 (2000). Counsel's decision whether to present a particular witness is generally a strategic choice which cannot support a claim of ineffective assistance of counsel. *Richardson*, 189 Ill. 2d 401, 727 N.E.2d 362; *People v. Griffin*, 178 Ill. 2d 65, 687 N.E.2d 820 (1997). However, "counsel may be deemed ineffective for failure to

present exculpatory evidence of which he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense." *People v. Tate*, 305 Ill. App. 3d 607, 612, 712 N.E.2d 826, 829-30 (1999). Put another way, to overcome the presumption that defense counsel's choice of strategy was sound, his decision must appear irrational and unreasonable such that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy. *People v. Faulkner*, 292 Ill. App. 3d 391, 686 N.E.2d 379 (1997).

■ Defendant maintains that there was no reasonable strategic reason not to present his testimony. We agree that if Thomas told the defendant that it would be to his benefit to talk to the Moline police, a much stronger case for suppression existed based on *Miranda, Edwards*, and *Innis*. However, this court has no way of determining, based on the record before us, whether defense counsel's decision not to call the defendant as a witness was based on reasonable trial strategy or incompetence. We do not know why counsel chose as he did, nor do we know what information was available to him at the time. Most importantly, we do not even know if counsel was aware of defendant's claim regarding Thomas's alleged statement. "Where the disposition of a defendant's ineffective assistance of counsel claim requires consideration of matters beyond the record on direct appeal, it is more appropriate that the defendant's contentions be addressed in a proceeding for postconviction relief, and the appellate court may properly decline to adjudicate the defendant's claim in his direct appeal from his criminal conviction." *People v. Burns*, 304 Ill. App. 3d 1, 11, 709 N.E.2d 672, 680 (1999); see also *People v. Morris*, 229 Ill. App. 3d 144, 593 N.E.2d 932 (1992); *People v. Gilbert*, 224 Ill. App. 3d 624, 586 N.E.2d 1308 (1992). Because the record is inadequate to resolve defendant's ineffective assistance of counsel claim, we decline to decide it. It is more appropriately addressed in a proceeding for postconviction relief, where a complete record can be made.

### Rule 605(a) Admonishments

■ Defendant next asserts that the trial court failed to properly admonish him regarding the need to file a motion for reconsideration if he wished to challenge his sentence. See Official Reports Advance Sheet No. 21 (October 17, 2001), Rs. 605(a)(3)(B), (C), (D), eff. October 1, 2001. The State concedes, and a review of the record confirms, that defendant was not properly admonished pursuant to Rule 605(a)(3). Accordingly, this case is remanded to the circuit court for proper admonishments and to allow the defendant to file a motion for reconsideration of his sentence, if he chooses to do so. See *People v.*

*Mazar*, 333 Ill. App. 3d 244, 775 N.E.2d 135 (2002) (remanding for compliance with Rule 605(a)).

## Sentencing Credit

■ Finally, defendant contends that the sentencing order inaccurately stated that he is entitled to credit for time served from November 17, 2001. The State concedes, and the record confirms, that the defendant was taken into custody on November 16. Therefore, the trial court is directed to amend the sentencing order to show that defendant is entitled to sentencing credit from November 16 rather than November 17.

In summary, we find that the trial court did not err in denying defendant's motion to suppress. We decline to rule on defendant's claim of ineffective assistance of counsel because doing so requires factual information not contained in the record on appeal. Defendant may reassert his claim in postconviction proceedings if he so chooses. We remand this cause for compliance with Rule 605(a)(3) and for amendment of the sentencing order.

For the reasons stated above, the judgment of the circuit court is affirmed. This cause is remanded for further proceedings consistent with this opinion.

Affirmed and remanded with directions.

BARRY and SCHMIDT, JJ., concur.