# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 3, 2011 Session

## STATE OF TENNESSEE v. DEVIN JEFFERSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-02225     Chris Craft, Judge**

---

**No. W2010-01600-CCA-R3-CD  - Filed October 27, 2011**

---

A Shelby County Criminal Court jury convicted the appellant, Devin Jefferson, of first degree felony murder committed during the perpetration of attempted robbery, and the trial court sentenced him to life.  On appeal, the appellant contends that the trial court erred by failing to grant his motion to suppress his statement to police because (1) the police continued to interrogate him after he invoked his right to remain silent, (2) the police continued to interrogate him after he invoked his right to counsel, and (3) his statement was coerced.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., joined.  J.C. MCLIN, J., not participating.[1]

Charles Mitchell, Memphis, Tennessee, for the appellant, Devin Jefferson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Ray Lepone and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The record reflects that in April 2008, the Shelby County Grand Jury indicted the

---

[1]The Honorable J.C. McLin died September 3, 2011. We acknowledge his faithful service to this Court and as a criminal court judge for Shelby County.

appellant, Daeshawn Tate, Victor Trezevant, and Courtney Washington for first degree felony murder committed during the perpetration of attempted robbery. The appellant was tried separately from his co-defendants.

The appellant does not contest the sufficiency of the evidence. Taken in the light most favorable to the State, the evidence at trial showed that the victim, Taylor Bradford, was a student and football player at the University of Memphis and lived in Carpenter Complex, an on-campus apartment complex. The appellant also was a student at the university and lived in Richardson Towers. The appellant's girlfriend, Erica Bell, lived in Carpenter Complex, had attended high school with the victim, and had dated the victim previously. The appellant's co-defendants had attended high school with the appellant but were not students at the university and did not know the victim.

On the night of September 29, 2007, the appellant met with his co-defendants in his dorm room and told them about the victim's "flashing" a lot of money. The four of them decided to rob the victim. The next evening, the appellant's co-defendants picked him up in Washington's gold Mercury Grand Marquis. The appellant used Bell's parking permit to gain access to the security gate at Carpenter Complex, and Washington drove into the apartment complex parking lot. The appellant showed his co-defendants where the victim lived, described the victim's car, and told them to keep him updated on the robbery. Washington drove out of Carpenter Complex, and the appellant got out of the car. The appellant went to Bell's apartment while his co-defendants waited in Washington's car for the victim.

Tate had never met the victim but telephoned the victim and pretended to be someone else. The victim said he would call Tate back later, and Tate telephoned the appellant. At some point, the victim telephoned Tate and told him, "I'm here." Tate and Trezevant got out of the car and walked to where the appellant had shown them the victim lived. The victim was not there, so they began walking back to Washington's car. Tate saw the victim's Lincoln Town Car, flagged him down, and approached the driver's side. Trezevant approached the passenger's side. While Tate was talking with the victim, Trezevant cocked a gun and told the victim, "Give me the money." The victim stepped on the accelerator, and Trezevant shot him in the chest. The victim's car crashed at a high rate of speed into a tree on Zach Curlin Street, and a police officer found him lying between the car's two front seats and pinned beneath the steering wheel.

After an investigation, the police arrested the appellant's co-defendants. All three implicated the appellant. On October 8, 2007, the police arrested the appellant at Bell's apartment and transported him to the police department. At first, the appellant refused to waive his rights and give a statement. However, he later spoke with Sergeants Mundy Quinn

and Ron Collins of the Memphis Police Department. Sergeant Quinn read the appellant's statement into evidence. According to the statement, it was the appellant's idea to rob the victim. The robbery was planned in the appellant's dorm room on September 29. About 6:00 or 7:00 p.m. on September 30, the appellant got home from work. Bell picked him up at Richardson Towers, and they went to Bell's apartment. Tate telephoned the appellant and asked for the "gate pass." The appellant got Bell's parking permit out of her car, got into Washington's car with his co-defendants, and used the permit to get them into the Carpenter Complex parking lot. The appellant showed his co-defendants where the victim lived and returned to Bell's apartment. At some point, the appellant saw the victim's car and informed Tate. The appellant did not know the victim was going to be killed.

The State introduced into evidence cellular telephone records from September 30, 2007, showing that Tate telephoned the appellant seven times between 7:20 p.m. and 9:40 p.m. The longest call lasted one minute, three seconds. The appellant called Tate ten times between 7:28 p.m. and 11:55 p.m. The longest call lasted one minute, thirty-two seconds. Tate called the victim twice, once at 8:17 p.m. and once at 8:18 p.m. The calls lasted twenty-eight and thirty-three seconds, respectively. The victim called Tate four times between 8:19 p.m. and 9:08 p.m. The longest call lasted one minute.

Erica Bell testified that on the evening of September 30, 2007, she picked up the appellant from Richardson Towers, and they went to Carpenter Complex. Bell used her parking permit to open the parking gate and parked her car in the lot. Then she and the appellant went to her apartment. While the appellant was there, he received two calls on his cellular telephone. For both calls, he left her apartment to talk on his phone, and he was gone about ten minutes each time. About 10:20 or 10:30 p.m., the appellant left Bell's apartment and took her parking permit with him. Later that night, Bell learned the victim had been shot and went to The Med. She said that when she told the appellant she had been to the hospital to check on the victim, "[h]e got a bit upset." She acknowledged that she used her parking permit to enter the parking gate at Carpenter Complex about 7:00 p.m. on September 30. When the State asked if she had been aware that her parking permit was used twice, once about 7:00 p.m. and again at 7:30 p.m., she said no.

Tate and Trezevant testified at trial about their involvement in the crime. They also testified that the appellant planned the robbery. The jury convicted the appellant of first degree felony murder committed during the perpetration of attempted robbery, and the trial court sentenced him to life.

## II. Analysis

The appellant claims that the trial court erred by denying his motion to suppress his

October 8, 2007 statement to police because (1) the police continued to interrogate him after he invoked his right to remain silent, (2) the police continued to interrogate him after he invoked his right to counsel, and (3) the police coerced him into giving his statement. The State contends that the trial court properly denied the motion to suppress. We agree with the State.

Before trial, the appellant filed a motion to suppress his October 8 statement to police, arguing that police officers continued to question him after he invoked his right to counsel and that his statement was coerced. At the suppression hearing, Sergeant Eric Freeman of the Memphis Police Department testified that he was involved in the investigation of the victim's death. As to how the police developed the appellant as a suspect, Sergeant Freeman explained, "In the initial investigation, a lot of individuals were saying that he had been involved in a fight with Taylor Bradford. . . . I believe it was October 7th, we came across three other individuals who named Devin Jefferson as the person who set up the robbery of Taylor Bradford." About 6:30 a.m. on October 8, the police went to Erica Bell's apartment to speak with her. The appellant happened to be there, and the police arrested him. The police transported the appellant to the police department and put him into an interview room. About 1:00 p.m., Sergeants Quinn and Collins spoke with him.

On cross-examination, Sergeant Freeman testified that the police arrested Tate, Trezevant, and Washington on October 7. The three men gave statements implicating the appellant. The next morning, the police arrested the appellant at Bell's apartment without a warrant. The police handcuffed the appellant, put him into a patrol car, and transported him to the police department.

On redirect examination, Sergeant Freeman testified that Tate, Trezevant, and Washington claimed the appellant set up the robbery the night before it occurred. The three men admitted their participation in the crime, and none of them knew the victim.

Sergeant Mundy Quinn testified that on October 8, 2007, Sergeant Freeman asked him and Sergeant Ron Collins to interview the appellant. Sergeants Quinn and Collins went into the interview room, gave the appellant an Advice of Rights form about 1:10 p.m., and advised the appellant of his rights. The first question on the form asked if the appellant understood his rights. In response to the question, the appellant wrote "yes" on the form. The second question on the form asked, "Having these rights in mind, do you wish to talk to us now?" Sergeant Quinn said that the appellant wrote "no" on the form and that the appellant told them that "his mother had told him that he probably needed an attorney." Sergeant Quinn said he and Sergeant Collins stood up to leave the room because "[t]he interview was over with." The appellant also stood up and asked where they were going. Sergeant Quinn said he told the appellant that they were going to speak with their supervisor and that they

-4-

would return to let the appellant know "where we were at in the case and where we were going." They left the room and told Lieutenant Armstrong that the appellant had refused to talk with them. Lieutenant Armstrong told them to charge the appellant with first degree murder. Sergeants Quinn and Collins returned to the interview room and told the appellant he was going to be charged with first degree murder. Sergeant Quinn said the appellant immediately stated, "I didn't shoot him. I want to give you a statement." Sergeant Quinn gave the Advice of Rights form back to the appellant. The appellant crossed out "no" and wrote "yes" beside the second question on the form. Then the appellant initialed the word "yes"; wrote the time, 1:14 p.m.; signed the form; and gave a statement. Sergeant Quinn said he never threatened the appellant or made promises to him.

On cross-examination, Sergeant Quinn acknowledged that the appellant was not free to leave the interview room. Sergeant Quinn said that when the appellant mentioned an attorney, Sergeant Quinn "took that as he did not want to [talk]." Sergeant Quinn did not have the appellant sign the Advice of Rights form at that time because the form was supposed to be signed only if the suspect waived his rights. Sergeant Quinn denied that he returned to the interview room and told the appellant, "[S]ince you're not giving us a statement, we're charging you with first degree murder." After the appellant waived his rights, Sergeant Quinn told him that Tate, Trezevant, and Washington also would be charged with first degree murder. Sergeant Quinn acknowledged that he did not take notes during the interview and that he did not audio- or video-record the interview. However, he wrote a "supplement" after the interview. Sergeant Quinn acknowledged that defense counsel asked him at the appellant's preliminary hearing if the appellant had requested a lawyer and that he answered, "I believe he did." However, he said he had not reviewed his supplement or the appellant's statement before the preliminary hearing. On redirect examination, Sergeant Quinn clarified that he accepted the appellant's statement about an attorney as a request for counsel and that he stopped the interview.

The appellant testified that the police arrested him at Bell's apartment on the morning of October 8 and handcuffed him with "guns drawn." They put him into a police car, where he waited for at least one hour. Then they took him to the police department, put him into an interrogation room with one small window, took off his handcuffs, and shackled him to a chair. The appellant fell asleep two or three times before Sergeants Quinn and Collins came into the room. The officers told him they wanted to talk with him and sat down. The appellant read an Advice of Rights form. The first question on the form asked if the appellant understood his rights, and the appellant wrote "yes" on the form. The second question on the form asked, "Having these rights in mind, do you wish to talk to us now?" The appellant wrote "no" on the form and initialed his answer. The appellant said he also told the officers, "I do not want to talk unless I have an attorney." The appellant signed the form and gave it back to the officers. The appellant acknowledged that he had seen and

executed an Advice of Right form on at least two prior occasions before his arrest on October 8. He also acknowledged that he understood his rights.

The appellant testified that the officers left the room for less than one minute and returned with Lieutenant Armstrong. He said that he did not initiate the conversation with them and that Lieutenant Armstrong told him, "[S]ince you want to be such a smart ass and not talk to us, we're going to charge you with first degree murder." He said Lieutenant Armstrong also told him that "you are going to have to worry about getting your hair braided by a man" and that "[y]our mother is going to have to put up the house to get you out." The officers told him that some of his co-defendants had accused him of shooting the victim. The appellant asked for a telephone in order to call an attorney, but the officers refused to give him one. They gave the Advice of Rights form back to him and told him to scratch out the word "no." They did not go over his rights again. The appellant eventually gave a statement because the officers told him that he would not get to use the telephone unless he talked with them.

On cross-examination, the appellant acknowledged that when he told Sergeants Quinn and Collins that he did not want to talk with them, they did not ask him anything else about the case and left the room. They returned with Lieutenant Armstrong, and Lieutenant Armstrong told the appellant that he was going to be charged with first degree murder. The appellant told the officers that he did not want to talk with them and that he wanted a telephone in order to call his mother so she could get him a lawyer.

In a written order, the trial court denied the appellant's motion to suppress. Regarding the appellant's claim that he requested an attorney, the trial court accredited Sergeant Quinn's testimony that the appellant said he probably needed an attorney. Citing State v. Saylor, 117 S.W.3d 239, 246 (Tenn. 2003), the court determined that the appellant made an equivocal request for counsel, which did not require the officers to stop questioning him. The court determined, however, that Sergeant Quinn treated the appellant's request as an unequivocal request and immediately terminated the interview. The court, again accrediting Sergeant Quinn's testimony, also determined that the officers returned to the interview room "only to inform him of what they were going to do, and the defendant then spontaneously initiated further questioning by stating 'I didn't shoot him,' indicating that he wished to give a statement." The court concluded that the officers did not re-enter the room "with the designed intent to confront the defendant with the murder charge in order to influence him to change his mind and give them a statement."

Regarding whether the appellant's statement was coerced, the trial court found the appellant's testimony incredible, stating that "the defendant's alleged harassment, discussions of men braiding the defendant's hair, promises and threats, wearing the defendant down,

could not have taken place between 1:10 and 1:14 p.m." The trial court held that the appellant's decision to talk with the officers "was not due to any coercion, promises or threats by Sgts. Collins and Quinn, but due to his own desire to distance himself physically from the robbery." The court concluded that the appellant executed a valid waiver of his rights and that he gave his statement freely and voluntarily.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

## A. Right to Remain Silent

The appellant claims that the trial court should have granted his motion to suppress because the police continued to interrogate him after he invoked his right to remain silent. Both the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide protection against compulsory self-incrimination. To this end, "'once warnings have been given, . . . if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At that point, he has shown that he intends to exercise his Fifth Amendment privilege.'" State v. Crump, 834 S.W.2d 265, 269 (Tenn. 1992) (quoting Miranda v. Arizona, 384 U.S. 436, 473-74 (1966)). Under Miranda,

> "interrogation" . . . refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results

of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

Rhode Island v. Innis, 446 U.S. 291, 301-02 (1980) (footnotes omitted).

In State v. Sawyer, 156 S.W.3d 531, 532 (Tenn. 2005), police officers arrested the defendant pursuant to a warrant for aggravated sexual battery. They transported him to the police department; took him into a detective's office; and seated him facing the detective, who was sitting behind a desk. Id. The detective then read the arrest warrant and the affidavit of complaint to the defendant. Id. The arrest warrant provided only that the defendant was charged with aggravated sexual battery. Id. at 532-33. The affidavit of complaint, however, detailed the facts of the crime. Id. at 533. After the detective read the affidavit of complaint, but before he read Miranda warnings to the defendant, the defendant admitted to rubbing the victim's leg but denied vaginal contact as alleged in the affidavit. Id. In determining whether the reading of the affidavit amounted to an "interrogation," our supreme court stated the following, which we find particularly helpful in this case:

> Some jurisdictions have held that an officer's statement advising an accused of the specific charges is not the functional equivalent of interrogation. See e.g., Enoch v. Gramley, 70 F.3d 1490, 1499-1500 (7th Cir. 1995) (officer advised the defendant that he was charged with murder and identified the victim); People v. Celestine, 9 Cal. App. 4th 1370, 12 Cal. Rptr. 2d 179, 181 (Cal. Ct. App. 1992) (officer informed the defendant that he was under arrest for "possession of rock cocaine for sale"); United States v. Brown, 737 A.2d 1016, 1021 (D.C. 1999) (officer told the defendant that he was charged with murder and identified the victim); People v. Parker, 344 Ill. App. 3d 728, 801 N.E.2d 162, 167, 279 Ill. Dec. 870 (Ill. App. Ct. 2003) (officer read arrest warrant to the defendant); Commonwealth v. Lark, 505 Pa. 126, 477 A.2d 857, 861 (Pa. 1984) (officer advised the defendant of his rights and the charges); Gates v. Commonwealth, 30 Va. App. 352, 516 S.E.2d 731, 733 (Va. Ct. App. 1999) (officer read arrest warrant to the defendant). Had the officers in this case read only the warrant to the defendant, we would agree.

Id. at 534-35 (emphasis added); see also State v. Randy C. White, No.

W2005-01794-CCA-R9-CD, 2006 Tenn. Crim. App. LEXIS 371, at **10-11 (Jackson, May 4, 2006) (stating, "While the Defendant was informed of why he was under arrest, [Officer] Dicus made no further attempt to engage the Defendant in a conversation or discuss the specifics of the arrest so as to prompt a response from the Defendant."); State v. Richard Frank D'Antonio, No. M2003-03052-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 1152, at *40 (Nashville, Oct. 26, 2005) (stating that "defendant's statement in this case was not directly responsive to the charges and were unforeseeable results of stating the crime charged and the possible range of punishment").

Turning to the instant case, the trial court specifically accredited Sergeant Quinn's testimony. Sergeant Quinn said that he and Sergeant Collins went into the interview room and read Miranda warnings to the appellant from an Advice of Rights form. The appellant invoked his right to remain silent and refused to speak with the officers. The officers stopped questioning him and got up to the leave the room. The appellant asked where they were going, and Sergeant Quinn told him they were going to speak with their supervisor and would return to tell him "where we are at in the case." Sergeant Quinn spoke with Lieutenant Armstrong, who told him to charge the appellant with first degree murder.[2] Sergeants Quinn and Collins returned to the interview room and informed the appellant of the charge. The officers did not attempt to engage the appellant in further conversation. Instead, the appellant blurted out that he did not shoot the victim and wanted to give a statement. Sergeant Quinn gave the Advice of Rights form back to the appellant, the appellant changed his answer from "no" to "yes" for the second question, and signed the form. The officers then questioned him about the crime. The appellant's stating that he did not shoot the victim was not responsive to Sergeant's Quinn's informing him about the murder charge. We agree with the trial court that the officers' informing the appellant of the charge did not amount to an interrogation. Therefore, the trial court properly denied the appellant's motion to suppress.

## B. Right to Counsel

Next, the appellant claims that the trial court should have granted his motion to suppress because the police continued to interrogate him after he invoked his right to

_____

[2]We note that according to the testimony at the suppression hearing, the day before the appellant's October 8 arrest, all three of his co-defendants admitted their participation in the crime. They also told the police that the appellant planned the robbery, indicating probable cause existed to support the murder charge. See State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (providing, "Whether probable cause is present depends upon whether the facts and circumstances and reliable information known to the police officer at the time of the arrest 'were sufficient to warrant a prudent man in believing that the [individual] had committed an offense.'") (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

counsel.[3]  Although we have already determined that Sergeant Quinn's informing the appellant of the murder charge did not amount to an interrogation, we will address this issue in the event of further appellate review.

As stated in the previous section, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution generally provide a privilege against self-incrimination. See State v. Turner, 305 S.W.3d 508, 515 (Tenn. 2010); see also Maryland v. Shatzer, 130 S. Ct. 1213, 1219 (2010).  Once someone requests an attorney, the interrogation must cease, and the person may not be subjected "'to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" Minnick v. Mississippi, 498 U.S. 146, 150 (1990) (quoting Miranda, 384 U.S. at 484-85); see also Shatzer, 130 S. Ct. at 1219; Turner, 305 S.W.3d at 515-16.

Although there may be differences between the protections provided by the United States and Tennessee constitutions with respect to the right to counsel, the standard used to determine whether one has validly invoked his right to counsel is the same under both.  See Turner, 305 S.W.3d at 517; see also Downey, 259 S.W.3d at 731.  Prior to the appellant's suppression hearing, our supreme court had held,

> The accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer . . . would understand the statement to be a request for an attorney." [State v.] Huddleston, 924 S.W.2d [666,] 670 [(Tenn. 1996)] (quoting [United States v.] Davis, 512 U.S. [452,] 459 [(1994)]).  If the suspect fails to make such an unambiguous statement, police may continue to question him without clarifying any equivocal requests for counsel.

Saylor, 117 S.W.3d at 246.  Shortly after the trial court denied the appellant's motion to suppress in this case, our supreme court clarified that this bright-line rule "applies only to post-waiver requests for counsel." Turner, 305 S.W.3d at 519.  "Where . . . a suspect makes an equivocal request for counsel prior to waiving Miranda rights, the police are limited to questions intended to clarify the request until the suspect either clearly invokes his right to

---

[3]The appellant argues that the police violated the his Sixth Amendment right to counsel.  However, "[t]he right to counsel under the Sixth Amendment to the United States Constitution guarantees the accused the assistance of counsel after adversarial criminal proceedings are initiated." State v. Downey, 259 S.W.3d 723, 732-33 (Tenn. 2008).  The Fifth Amendment right to counsel, which allows a suspect to request that counsel be present during police-initiated custodial interrogation, is at issue in this case. See id. at 732.

counsel or waives it." Id.

Turning to the present case, the trial court specifically accredited Sergeant Quinn, who testified that the appellant said that "his mother had told him that he probably needed an attorney." We agree with the trial court that the appellant's request for counsel was equivocal. See Saylor, 117 S.W.3d at 246 (holding that statements such as "I have to have a lawyer present, I reckon" and "I might need a lawyer" are generic and equivocal statements that do not invoke the right to counsel). Therefore, pursuant to Turner, the officers were not required to stop the interview but should have clarified the appellant's request for an attorney. In any event, Sergeant Quinn testified that he took the appellant's statement to be an unequivocal request for counsel and that he immediately stopped questioning the appellant. The appellant acknowledged on cross-examination that once he invoked his right to remain silent and requested counsel, the officers stopped questioning him and left the room. Therefore, we find no merit to the appellant's claim that the officers violated his Fifth Amendment right to counsel. Moreover, given that the officers did not "interrogate" the appellant when they returned to the interview room, they did not violate the appellant's constitutional rights.

## C. Coerced Statement

Finally, the appellant contends that his statement was coerced by the officers' telling him that he was being charged with first degree murder and that his co-defendants also would be charged with first degree murder. He also claims that he did not have enough time to read the Advice of Rights form and have it explained to him. Finally, he claims that he was in a "coercive environment" because he was arrested at 6:40 a.m. by police with guns drawn, was transported to the police department, was shackled to a chair or table, sat alone until 1:00 p.m., was not allowed to telephone his mother or an attorney, and never received food, water, or a bathroom break.

Again, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). However, if an accused is informed of his Miranda rights and knowingly and voluntarily waives those rights, he may waive the privilege against self-incrimination. Id. (citing Miranda, 384 U.S. at 444-45, 478-79). Whether a waiver has been made voluntarily, knowingly, and intelligently must be determined by the totality of the circumstances surrounding the interrogation. State v. Van Tran, 864 S.W.2d 465, 472-73 (Tenn. 1993); State v. Benton, 759 S.W.2d 427, 431-32 (Tenn. Crim. App. 1988).

Upon review, we hold that the evidence does not preponderate against the trial court's findings. See Odom, 928 S.W.2d at 23 (providing that the trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence). The trial court accredited Sergeant Quinn's testimony about informing the appellant of the murder charge and the appellant's stating that he did not shoot the victim. Sergeant Quinn testified that he gave the Advice of Rights form back to the appellant, that the appellant marked out "no" and wrote "yes" on the form, and that the appellant signed the form. The appellant acknowledged at the suppression hearing that he understood his rights. Sergeant Quinn also testified that he did not tell the appellant that his co-defendants were going to be charged with first degree murder until after the appellant signed the waiver of rights form.

Regarding the appellant's "coercive environment," the trial court discredited the appellant's testimony, concluding that the appellant's numerous claims of harassment and coercion could not have occurred in just four minutes. Morever, the appellant never alleged at the hearing that his having been shackled for hours in the interview room or not having access to food, water, or bathroom breaks coerced him into giving his statement. We hold that the trial court properly denied the motion to suppress.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE