NOTICE
Decision filed 03/22/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180431-U

NO. 5-18-0431

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Lawrence County. |
| | ) | |
| v. | ) | No. 15-DT-22 |
| | ) | |
| ASHLEY R. DAVIS, | ) | Honorable |
| | ) | Robert M. Hopkins, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's convictions for driving under the influence are affirmed where she was not denied effective assistance of trial counsel.

¶ 2    This is a direct appeal from the circuit court of Lawrence County. The defendant, Ashley R. Davis, was convicted of two counts of driving under the influence. On August 24, 2018, she was sentenced to a total of 24 months of probation and 45 days in the county jail. On appeal, the defendant contends that she was denied effective assistance of trial counsel. For the reasons that follow, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      On January 6, 2017, the defendant was charged by information with two counts of driving under the influence (DUI) (625 ILCS 5/11-501(a)(4), (6) (West 2016)).  As to count I, it was alleged that the defendant drove a 2014 Nissan Altima with the New York registration number "GJA6622" on United States Highway 50 and Illinois Route 1 while under the influence of a drug or combination of drugs to a degree that rendered her incapable of safely driving.  As to count II, it was alleged that the defendant, while driving said vehicle on said roads, was under the influence of or had an amount of a drug, substance, or compound in her breath, blood, or urine resulting from the unlawful use or consumption of a controlled substance.

¶ 5      Prior to trial, the State filed a motion *in limine* seeking to exclude the results of a drug test taken at Lawrence County Memorial Hospital.  The State's motion argued that the results would constitute inadmissible hearsay because none of the disclosed witnesses analyzed the collected specimen.  The defendant's trial counsel (hereinafter, trial counsel) did not contest the State's motion.  As such, the trial court granted the State's motion *in limine*.

¶ 6      On January 9, 2017, the defendant's two-day jury trial commenced.  The State first presented testimony of Brett Ernst, who was the owner of the Lazy 8 Body Shop on Route 50 near the Lawrence-Richland County line.  Ernst testified that on the afternoon of May 8, 2015, he was leaving Olney, Illinois, and stopped at the intersection of Highways 250 and 50 looking west.  Ernst observed that it was not safe for him to pull out because of a vehicle coming from the west.  After letting the vehicle pass, Ernst pulled out to head in

2

the same direction. Ernst then observed a white Nissan Altima with New York plates swerving and going off the road at least four times. Ernst recalled that the Altima was "so far onto the shoulder that it was creating so much dust coming up on the road that it was not safe to see. It was like a fog."

¶ 7 The Altima swerved at least twice into the oncoming lane with half of the vehicle in the oncoming lane's traffic. Other vehicles had to swerve off the road to avoid hitting the Altima head on. This erratic driving scared Ernst, who believed someone "was going to get killed." Ernst pulled over and called the police from his cell phone. After doing his best to describe what he had witnessed over the phone, Ernst subsequently went to Lawrenceville and filed a complaint with the Lawrence County Sheriff's Department.

¶ 8 Officer Byron Middlecoat, a deputy sheriff for the Lawrence County Sheriff's Department, responded to Ernst's 9-1-1 call about a reckless driver in Lawrence County. Middlecoat learned that the vehicle was a silver Nissan Altima with a New York plate reading "GJA6622." After receiving this information, Middlecoat started patrolling westbound on Highway 50 in an attempt to locate the suspect vehicle. The suspect vehicle passed him "by the green house exit on Highway 50." Middlecoat turned around to follow the vehicle. As he followed the Altima around a curve west of the Embarras River bridge, Middlecoat noticed the Altima run off the road, cross the fog line, and kick up dirt and gravel before returning to the roadway. Middlecoat noted that the passenger-side tires were completely off the roadway.

¶ 9 Middlecoat initiated a traffic stop, pulling the suspect vehicle over on the exit ramp from Highway 50 to Route 1, which was in Lawrence County. Middlecoat radioed

dispatch, advised them of the traffic stop, and provided dispatch with information about the vehicle and his location. Dispatch later advised Middlecoat that the vehicle was rented to the defendant. While Middlecoat communicated with dispatch, he noticed that the female driver was leaning out of the driver's side door. Middlecoat approached the vehicle, and the woman told him that she was looking for a cigarette that she dropped. Middlecoat had not seen her smoking, and he did not see a cigarette on the ground. Middlecoat noted that three young children were in the backseat of the vehicle.

¶ 10    The driver provided Middlecoat with her driver's license and insurance information, which identified her as the defendant. During the exchange, Middlecoat noticed that she had "a slurred, slow speech and that her pupils were constricted." Middlecoat, who was trained in DUI detection and standardized field sobriety testing and who had made approximately 80 DUI arrests in his career, took these factors to indicate that the defendant was possibly under the influence. With this suspicion, Middlecoat asked the defendant to exit the vehicle and follow him to the rear of the vehicle.

¶ 11    Middlecoat asked the defendant whether she had consumed any alcoholic beverages or taken any prescription medication. The defendant responded that she had taken prescription medications the night before. The defendant provided Middlecoat with the prescriptions she had on her, which included cyclobenzapram, gabapentin, and alprazolam. Middlecoat believed that alprazolam was a controlled substance. The defendant volunteered that she had been cleared "by Jesse" to drive on her medications, and that she had several health issues. While the defendant was not more specific, Middlecoat thought she was referring to Jesse White, the Illinois Secretary of State, which he found unusual.

4

When asked about documentation, the defendant said the information was on her record, but dispatch informed Middlecoat that the defendant did not have any special restrictions or permits on her driving record.

¶ 12   The defendant then consented to performing field sobriety tests. Middlecoat testified that the defendant swayed from side to side while walking to the rear of the vehicle. The first test performed was a horizontal gaze nystagmus (HGN), during which the defendant stood with her legs together and her hands down to her side. The defendant was advised to look at the tip of Middlecoat's finger, follow it only with her eyes, and not move her head. Middlecoat observed a lack of smooth pursuit in both her right and left eyes. The defendant's eyes failed to track Middlecoat's finger as instructed, which was followed by a jerking motion. The defendant exhibited six total signs of impairment based on the HGN test.

¶ 13   Based on the defendant's performance on the HGN test as well as her slurred speech, constricted pupils, driving, and statements, Middlecoat decided to proceed further with his investigation. He next requested that the defendant perform the "walk and turn" test. Middlecoat asked the defendant to stand to his side, assume there was a straight white line right in front of her, and place her left leg on the line then her right leg right in front of it. During this time, her hands needed to remain down at her sides. The defendant was required to take nine steps forward touching her heel to her toe on every step while counting aloud. If completed, she would do the same thing in reverse. However, the defendant failed on four steps forward and three steps backward; she raised her arms for balance and

5

stepped off the assumed white line. The defendant informed Middlecoat that her medication adversely affected her balance.

¶ 14 While Middlecoat was "fairly certain" that the defendant was under the influence at this point, he continued his investigation by administering the one-legged standing test. Here, the defendant was required to stand with her feet together and her hands down at her side. Middlecoat explained that when the test began, it was expected that the defendant would lift her heel approximately six inches off the ground counting while looking down at her toes for 30 seconds or until she was told to stop. About three seconds after starting the test, the defendant requested to perform the test on a different surface, which Middlecoat allowed. The defendant failed to count, placed her foot on the ground several times, and almost fell so Middlecoat asked her to stop to prevent her from injuring herself.

¶ 15 The defendant was placed under arrest, but she was allowed to call someone to pick up her children. The defendant asked if she could sit in the back with her children without being handcuffed, which Middlecoat allowed. After her children were picked up, the defendant was handcuffed and secured in the back of Middlecoat's squad car. The defendant was transported to Lawrence County Memorial Hospital for chemical testing. Middlecoat made this determination because the signs pointed toward the defendant being under the influence of drugs rather than alcohol.

¶ 16 The defendant was taken through the front door of the hospital and registered. She signed the motorist warnings and consented to blood and urine testing. After registration, Middlecoat walked the defendant to the lab for testing. In the lab, Middlecoat advised the

6

phlebotomist that she should complete a DUI state kit, which contained two vials for blood and two bottles for urine. The defendant's blood and urine samples were then collected.

¶ 17   As to the defendant's urine sample, Middlecoat testified that she was checked and allowed to go into the restroom to provide her sample, which was then initialed and dated. The samples were sealed and placed into a DUI evidence collection kit along with the relevant paperwork. Upon returning to the sheriff's office, Middlecoat placed the DUI evidence kit into his evidence locker.

¶ 18   Taylor Wallace, a lab assistant at Lawrence County Memorial Hospital, testified about the hospital's procedure for gathering samples. She did not specifically recall her interaction with the defendant on May 8, 2015, but it was one of her duties to collect blood and urine samples in connection with law enforcement investigations. As to the process for collecting samples for law enforcement, Wallace stated that an officer would bring in a suspect with a state kit, and she would ask the officer to break the integrity seal on the kit. The kit would contain tubes to draw blood with, two urine cups, and a chain of custody form. The blood samples would be drawn first, and after the collection was done, Wallace would label the tubes and sign the form. Then, if the suspect is female, Wallace would go into the restroom with her to observe and collect the urine sample. Wallace would receive the urine sample in a big sterile cup, and after she exited the restroom with the suspect, she would pour them into the smaller individual cups for the kit. The cups are then sealed with pre-labels contained in the kit; Wallace would initial them and indicate the time and date, and the officer would also sign and initial them. Wallace would then label the cups and put them in the kit. After the samples were taken and sealed, the officer would finish

7

signing the chain of custody form, put everything in the kit, seal the kit, and take it with him.

¶ 19    Wallace testified that if anything unusual happened during the collection of a sample, she would document that and recollect the sample. She would not send off anything she felt was inaccurate. Wallace testified there was no indication that anything had gone wrong with the collection of the defendant's sample.

¶ 20    Lora Furlong, an evidence technician with the Illinois State Police (ISP) Crime Laboratory, testified that she received and inventoried the evidence kit relating to the defendant's case. After examining a photocopy of the DUI kit, Furlong testified that the kit was sealed and in good condition when she received it. Trial counsel objected to introducing the photocopy of the sealed kit as State's Exhibit 4 because no foundation was established linking the defendant to the kit as it was not the original version. In response, the State argued that the original was not available but agreed it would further question the witness to establish the foundation. Thereafter, Furlong testified that she knew the exhibit was the kit involved in the defendant's case because the partially covered return address showed "l-a-w" for Lawrence County and Lawrenceville. She also noticed that the date stamp on the kit indicated it was received on May 14, which coincided with the date the kit was sent. Furlong kept records of each piece of evidence received at the state lab, and she indicated that State's Exhibit 4 was a photocopy that she created with regard to this specific case. The trial court overruled the objection, finding that the original was unavailable and that the further questioning of Furlong was sufficient to establish foundation.

8

¶ 21    Lab procedure required Furlong to note if the DUI kit was not sealed properly, but the seal was proper in this case. Furlong testified that upon receiving the sealed DUI evidence kit, she broke the seal, took inventory of what was inside, logged the contents, placed barcode labels on each item of evidence, and placed the evidence into a refrigerated vault. The kit contained two tubes of urine, two vials of blood, and a standard insert, which she listed on her handwritten evidence receipt. Trial counsel objected to admitting the evidence receipt as State's Exhibit 1 for lack of foundation. Furlong then testified that it was her evidence receipt, and that the kit was ultimately logged under the defendant's name. The samples would have remained in the vault until an analyst was assigned to the case; in this case, Shelly Chase was assigned as the analyst. On cross-examination, Furlong testified that the defendant's original DUI evidence kit had been disposed of because the lab did not have room to keep all the kits it received.

¶ 22    The samples were received by Shelly Chase, a forensic scientist with the Illinois State Police. In analyzing the samples, she performed a series of confirmatory tests. She initially screened the samples for volatiles including alcohol. She then tested for different classes of drugs, including opiates and benzodiazepines. When Chase was questioned by the State about the defendant's test results, trial counsel objected as to foundation. The State then recalled Furlong to establish a foundation for Chase's conclusions. Furlong detailed the identifying information included on the defendant's DUI evidence kit. Specifically, the return address was listed on the outside of the kit. Inside the envelope, the evidence was clearly labeled with the defendant's name and other information. The kit included the nurse's name, the investigating officer's name, the agency, and a standard

DUI insert sheet. Furlong reviewed State's Exhibit 5, which was the DUI insert sheet for this case. It listed the defendant's name, the date of May 8, 2015, Middlecoat as the officer involved, Wallace as the nurse who collected the sample, and a brief narrative of the traffic stop. The samples themselves were also labeled with the defendant's name and other information as well as the same information as to officer, date, and nurse.

¶ 23 Chase then testified that she retrieved the samples from the vault herself prior to performing her evaluation. The samples were marked with a laboratory case number, and the case number displayed on the samples Chase tested matched the defendant's case number. The test of the defendant's blood was negative for volatile substances. When the State again asked Chase about the urine test results, trial counsel objected as to foundation; the trial court overruled the objection based on future testimony from Middlecoat. The urine collected from the defendant tested positive for opiates and benzodiazepines. Trial counsel again objected when the State asked for specifics. However, the objection was overruled, and Chase testified that the urine contained morphine, alprazolam, and hydroxyalprazolam. The prescriptions collected from the defendant would have caused the positive result for benzodiazepines.

¶ 24 The State then sought to introduce a copy of the lab report as State's Exhibit 3, asking Chase what the lab report indicated. Trial counsel objected as to hearsay, but the trial court overruled the objection. After Chase described her lab report, the State asked for it to be admitted again over trial counsel's renewed hearsay objection. The State argued that because the report was prepared by Chase in her normal course of employment, it was not hearsay; the court agreed so long as there was foundation to show it was done in the

ordinary course of business. Chase then testified that she regularly generated such reports as part of her everyday duties and every time she completed a blood or urine analysis. The lab report was then admitted as State's Exhibit 3.

¶ 25 Chase then testified that none of the prescriptions collected from the defendant during the traffic stop would trigger a positive result for morphine, which was a controlled substance in Illinois. Morphine and alprazolam together could lead to memory loss, coordination loss, decreased judgment, sleepiness, and tiredness. Either of them alone could lead to someone being too impaired to drive.

¶ 26 On cross-examination, Chase again stated that she retrieved the defendant's samples from the refrigerated vault, and she explained that samples were refrigerated more as a matter of procedure to help prevent things from breaking down or changing. However, Chase testified that hydrocodone would not give a false positive for morphine because they are two different drugs, although they are both opiates. Alprazolam also would not break down into morphine. Chase explained that a kidney disorder would not present different results than from someone with healthy kidneys. When questioned about refrigeration protocols for samples, Chase opined that a sample being left out of the refrigerator would not trigger a false positive result for morphine. The samples tested in this case had been destroyed because the lab only kept them for a year after testing.

¶ 27 At this point in the trial, Middlecoat was recalled to the stand to lay further foundation for admission of the results of the defendant's drug tests. Middlecoat testified that the form submitted with the DUI kit included the case number, the investigating agency, the date, the investigating officer, the subject, and the name of the phlebotomist

11

who collected the sample. Upon being shown State's Exhibit 5, Middlecoat recalled that he and the phlebotomist completed the form, which listed his name, the defendant's name, and Wallace's name. The State sought to admit Exhibit 5, but trial counsel objected based on hearsay. The trial court admitted State's Exhibit 5 on the basis of it being a document that was routinely prepared by Middlecoat, who testified as to what was prepared and that investigators routinely prepare the document as a part of every DUI investigation. Middlecoat then identified State's Exhibit 4 as a photocopy of the DUI evidence kit that he prepared and sent to the state lab. The kit was in Middlecoat's custody from the time he put it in his evidence locker until he mailed it to the lab in Springfield; no one else had access to the locker. The evidence locker was not refrigerated or air-conditioned, and the sample was not mailed in any special packaging to keep it cool. The kit was received in Springfield on May 13, 2015.

¶ 28    After the State rested, trial counsel filed a motion for directed verdict, which was denied. As part of the defense case, trial counsel sought to introduce the defendant's prescription records. The trial court permitted such evidence only as to the defendant's prescription for hydrocodone. The court allowed the defendant to testify only about the prescriptions that had already been discussed during the State's evidence.

¶ 29    The defendant testified in her own defense at trial. The defendant initially detailed the medical issues she was experiencing prior to May 8, 2015. She acknowledged that she was taking prescription medications around that time, but she testified that she did not consume them on the day she was pulled over. Her hydrocodone prescription instructed her to take it every six to eight hours as needed, and she had not taken it for about one week

12

prior to May 8, 2015. She did not notice any significant side effects from taking her medications. The defendant testified that on May 8, 2015, she was not having any trouble driving. She said that she crossed the fog line only once, and she swerved because she was trying to reach a cigarette that had fallen under her seat. The defendant had problems with her eyes and wore sunglasses frequently, but she took them off when she was stopped by Middlecoat. Her lower back problems caused balance issues and caused her to not walk in a straight line. She also wore dentures, which could have come loose while driving for multiple hours and caused her slurred speech. She did not have trouble walking into the hospital because it was a slow walk, and she was handcuffed in front of her body.

¶ 30    The defendant testified that she did not go into the restroom to collect her sample alone. Rather, a lab technician went into the restroom with the defendant while she produced her urine sample.

¶ 31    After the defense rested, trial counsel renewed its motion for directed verdict, which the trial court again denied.

¶ 32    The jury found the defendant guilty on both counts.

¶ 33    After trial, trial counsel withdrew with the trial court's consent. The court then appointed posttrial counsel to represent the defendant, and on May 4, 2017, posttrial counsel filed a motion for new trial. The motion argued, *inter alia*, that trial counsel was ineffective for failing to (1) call witnesses to testify about the result of the drug test taken at Lawrence County Memorial Hospital, which allegedly showed that the defendant did not test positive for morphine; (2) contest the motion *in limine* relating to the hospital drug test results; (3) object to State's Exhibit 3 on foundation grounds; (4) call expert witnesses

relating to the defendant's medical issues, prescriptions, and how they affected her drug tests as well as the field sobriety tests; and (5) adequately cross-examine the State's witnesses.

¶ 34   On May 5, 2017, a hearing was held on the posttrial motion. In relevant part, posttrial counsel argued that trial counsel was ineffective in failing to adequately prepare for trial in several instances. It was specifically argued that trial counsel failed to attempt to retrieve the favorable test results from Lawrence County Memorial Hospital that said the defendant did not have morphine in her system and failed to object to the motion *in limine* relating to those results. Posttrial counsel additionally argued trial counsel was ineffective for not properly objecting to the admission of Exhibit 3 on foundational grounds and for not objecting to Chase testifying about the results because there was no testimony from Wallace being in the room with the defendant when collecting the sample when the evidence was admitted, and for conducting a "somewhat lacking" cross-examination. Additionally, posttrial counsel asserted trial counsel was ineffective for failing to have an expert witness testify that the defendant's prescription hydrocodone use could result in a false positive test result for morphine.

¶ 35   On November 28, 2017, the trial court denied the defendant's motion for new trial. The court found that there was an unbroken chain of custody regarding the defendant's samples which were "passed by medical technologist to officer to the police department evidence refrigerator to another officer to employee of Department of Public Health." Further, the court found that, "The extent and intensity of the cross examination of a State's

14

witness by defense is a tactical issue for defense counsel. There is no showing that a more extensive cross examination would have affected the result at trial."

¶ 36    On August 24, 2018, the defendant was sentenced to 24 months of probation and 45 days in the county jail.[1]  The defendant was also ordered to pay a $1000 fine, applicable court costs, and a $1000 equipment fee.

¶ 37    The defendant filed her notice of appeal on September 7, 2018.

¶ 38                                    II. ANALYSIS

¶ 39    The defendant's sole contention on appeal is that she was denied effective assistance of counsel.   Our review of ineffective assistance of counsel claims is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984).  To succeed on a claim of ineffective assistance of counsel under the *Strickland* standard, one must show both that (1) counsel's representation fell below an objective standard of reasonableness (deficient performance prong) and (2) a reasonable probability exists that, but for the error, the result would have been different (prejudice prong).  *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011).  A defendant must satisfy both prongs of the *Strickland* test to succeed on a claim of ineffective assistance of counsel.  *People v. Simpson*, 2015 IL 116512, ¶ 35. Thus, defendant's failure to establish either deficient performance or prejudice will be fatal to the claim.  *Id.*

---

[1]Although the trial court initially ordered the defendant to spend 90 days in the county jail, it entered a supplemental order on September 7, 2018, reducing her jail time to 45 days.

15

¶ 40    To establish deficiency under the first prong of the *Strickland* test, "defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). The reviewing court must evaluate counsel's performance from his perspective at the time rather than "through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). An evaluation of counsel's actions cannot extend into matters involving the exercise of judgment, strategy, or trial tactics. *People v. Penrod*, 316 Ill. App. 3d 713, 722 (2000); see also *Perry*, 224 Ill. 2d at 344. "Reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable." *Manning*, 241 Ill. 2d at 335.

¶ 41    To establish prejudice, "defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 42    Here, the defendant initially contends that trial counsel was ineffective for failing to adequately investigate and present the potentially exculpatory evidence of the defendant's drug test taken at Lawrence County Memorial Hospital where she allegedly tested negative for morphine. The State counters that because the defendant's claim relies on the alleged results of a lab test that is not contained in the record, it is more appropriately raised in a postconviction proceeding. In support of its position, the State cites *People v. Talbert*, 2018 IL App (1st) 160157, and *People v. Parker*, 344 Ill. App. 3d 728 (2003).

¶ 43    In *Talbert*, the First District reviewed defendant's claim that his counsel was ineffective for failing to present witnesses to provide exonerating testimony that he

16

promised during opening statements. *Talbert*, 2018 IL App (1st) 160157, ¶¶ 47-54. The court instructed:

> "When the basis of a defendant's ineffective assistance of counsel claim is based on matters not of record, the claim cannot be brought on direct appeal. [Citation.] Where the record is silent as to counsel's strategy, the defendant's ineffective assistance of counsel claim may be more appropriately raised in a collateral proceeding." *Id*. ¶ 53.

The court found that based on the record before it, it could not "exclude the possibility that trial counsel diligently interviewed the witnesses and that those witnesses substantially changed their account of events without warning." *Id*. ¶ 54. Because defendant could not show from the trial record that defense counsel was ineffective, the court affirmed his convictions. *Id*. ¶¶ 54, 56.

¶ 44    In *Parker*, the Third District considered whether defense counsel's decision not to call defendant as a witness when his testimony could have resulted in a different result on defendant's motion to suppress, and ultimately, his trial constituted ineffective assistance. *Parker*, 344 Ill. App. 3d at 736-37. Although the court agreed that defendant's alleged testimony could have provided a stronger case for suppression, the court concluded that it had "no way of determining, based on the record before [it], whether defense counsel's decision not to call the defendant as a witness was based on reasonable trial strategy or incompetence." *Id*. at 737. The court did "not know why counsel chose as he did, nor [did it] know what information was available to him at the time." *Id*. Therefore, the court declined to consider defendant's ineffective-assistance-of-counsel claim, finding it would be more appropriately raised in postconviction proceedings. *Id*.

17

¶ 45    Additionally, our research has revealed several other cases in which Illinois courts have declined to address a defendant's ineffective-assistance-of-counsel claims where they would have to consider matters outside the record to resolve such claims. In *People v. Bew*, the Illinois Supreme Court considered whether defense counsel was ineffective for failing to file a motion to suppress. *People v. Bew*, 228 Ill. 2d 122, 133-35 (2008). The court held that the record was insufficient to address the issue on direct appeal and concluded that defendant could raise the issue in a postconviction proceeding in which both defendant and the State would have the opportunity to develop a factual record bearing precisely on the issue. *Id*. at 135.

¶ 46    In *People v. Winkfield*, the First District considered whether defense counsel was ineffective for failing to call certain alibi witnesses as promised in his opening statement. *People v. Winkfield*, 2015 IL App (1st) 130205, ¶¶ 18-38. The court affirmed defendant's conviction, finding that the record on appeal was inadequate to determine whether counsel's failure was "due to any deficient representation or merely a failure [on the part of the witnesses] to cooperate or appear, or some other unforeseen [or] unexpected event." *Id*. ¶ 27. The court found that disposition of defendant's claim required inquiry into matters outside the record on direct appeal. *Id*. The court held that when the record is insufficient to address the ineffective assistance claim, a reviewing court "may decline to adjudicate the claim in a direct appeal in favor of addressing it in a proceeding for postconviction relief where matters outside the common law record can be considered." *Id*. ¶ 28.

¶ 47    In the present case, the record on direct appeal is similarly insufficient to address the defendant's ineffective-assistance-of-counsel claim regarding trial counsel's failure to

18

investigate and present the allegedly exculpatory drug test results. The hospital drug test results are mentioned in two places in the common law record and two places in the transcript of the trial court proceedings. However, there is no report of the test results themselves included in the record. Similarly, there is no discussion in the record as to what witnesses, if any, could be called to testify and lay a proper foundation for their admission. The record is also devoid of any explanation as to why trial counsel chose to not introduce the test results, instead agreeing that they should not be admitted. Given the incomplete record on direct appeal regarding trial counsel's reasoning for failing to present the hospital drug test results, we would be required to engage in speculation and conjecture in determining whether counsel's decision was tactical or the result of ineffectiveness. Our supreme court has held, though, that we cannot resolve a claim of ineffective assistance based on conjecture or speculation. *Bew*, 228 Ill. 2d at 134-35; see also *Talbert*, 2018 IL App (1st) 160157, ¶ 53 ("Where the record is silent as to counsel's strategy, the defendant's ineffective assistance of counsel claim may be more appropriately raised in a collateral proceeding."). As the record on appeal is insufficient for us to resolve the defendant's claim of ineffective assistance, we decline to adjudicate the claim on direct appeal in favor of considering it in a postconviction proceeding where matters outside the common law record can be considered and a factual basis developed for resolution of the issue.

¶ 48 The defendant also maintains that trial counsel was ineffective for failing to properly object to admission of the ISP Crime Lab drug test results. While trial counsel objected to the results as hearsay, the defendant argues that counsel should have objected on

19

foundation or chain of custody grounds. The defendant also faults trial counsel for eliciting testimony the State needed to establish a sufficient chain of custody for the test results.

¶ 49    It is well established that "decisions regarding 'what matters to object to and when to object' are matters of trial strategy." *Perry*, 224 Ill. 2d at 344 (quoting *People v. Pecoraro*, 175 Ill. 2d 294, 327 (1997)). Defense counsel's failure to object to testimony may be a matter of trial strategy and does not necessarily constitute deficient performance. *People v. Graham*, 206 Ill. 2d 465, 478-79 (2003) (citing *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991)).

¶ 50    Our review of the record reveals that the State's witnesses properly established the chain of custody for the ISP Crime Lab drug test results, and thus, trial counsel's decision to object based on hearsay rather than foundational grounds did not constitute deficient performance. Middlecoat testified at trial about the steps taken to collect the defendant's DUI evidence kit and to complete the paperwork submitted with the kit. Further, although Wallace did not recall the defendant's case specifically, she testified extensively as to her standard procedures in collecting samples to be sent off for testing. One of those procedures was that if the suspect was a female, she would have gone into the restroom with her to observe and collect the urine sample. Wallace further testified that she would have documented if something unusual happened during collection of the sample and recollected it, and she did not recall or document that anything had gone wrong in this case. Middlecoat testified that he took the evidence kit from the hospital, stored it in his evidence locker that only he had access to, and then mailed it to the ISP Crime Lab. Furlong testified that she received the kit, made a copy of it, and stored it in the refrigerated vault, where

Chase retrieved the samples prior to testing them. We also note that trial counsel did object repeatedly throughout the preceding testimony and as to each of the State's exhibits; several of those objections were for lack of foundation.

¶ 51 Based on the foregoing, we find that an additional objection based on foundation would have been without merit, and trial counsel's decision not to lodge such an objection did not constitute deficient performance. See *Graham*, 206 Ill. 2d at 478-79; *Pecoraro*, 144 Ill. 2d at 13; see also *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14 (defense counsel will not be found ineffective for failing to assert a meritless objection). Moreover, because the defendant's testimony that she did not go into the restroom alone was cumulative of Wallace's testimony that she would have gone into the restroom with a female subject to collect a urine sample, the defendant cannot establish that she was prejudiced by trial counsel eliciting such testimony. Because the defendant has not shown that trial counsel's performance was deficient or that she was prejudiced, she has failed to establish that she was deprived of effective assistance of counsel.

¶ 52                                 III. CONCLUSION

¶ 53 For the foregoing reasons, the judgment of the circuit court of Lawrence County is hereby affirmed.


¶ 54 Affirmed.