NOTICE
Decision filed 11/12/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220546-U

NO. 5-22-0546

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 21-CF-3769 |
| | ) | |
| WILLIAM A. JENKINS, | ) | Honorable |
| | ) | Neil T. Shroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BOLLINGER* delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction and sentence where defense counsel did not provide ineffective assistance by not requesting separate verdicts on the three reasonable theories of first degree murder charged.

¶ 2    Defendant-Appellant, William A. Jenkins, was found guilty following a jury trial in the circuit court of the Third Judicial Circuit of Madison County of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2020)) and attempted armed robbery (*id.* § 8-4(a), 18-2(a)(2)). He was thereafter sentenced to 50 years for first degree murder, 15 years for a mandatory firearm enhancement where the jury found a firearm was used in the commission of the offense, and 10 years for attempted armed robbery, all to run consecutively for a total of 75 years of imprisonment

---

*Justice Welch was originally assigned to the panel before his death. Justice Bollinger was later substituted on the panel and has reviewed the briefs and record.

1

in the Illinois Department of Corrections. Defendant now appeals his conviction and sentence, maintaining that his defense counsel was ineffective for failing to request the verdicts for his first degree murder conviction be separated, where he was charged under three separate theories of first degree murder: (1) intentional first degree murder (*id.* § 9-1(a)(1)); (2) knowing first degree murder (*id.* § 9-1(a)(2)); and (3) felony first degree murder (*id.* § 9-1(a)(3)). Defendant does not challenge the conviction itself but asserts that a partition of the first degree murder verdict would have resulted in a conviction only on the theory of felony murder, and thus would have resulted in the underlying felony, attempted armed robbery, merging into the murder conviction and only a 65-year sentence. For the following reasons, we affirm the judgment and sentence of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4        On December 7, 2021, Andre Hutson was shot multiple times in the front yard of Ingrid Kramer's home, after leaving her house at approximately 11:45 p.m. He was pronounced dead shortly thereafter, in the early hours of December 8, 2021. Dr. Nathaniel Patterson, a forensic pathologist, performed Hutson's autopsy. Dr. Patterson testified that Hutson had multiple gunshot wounds, bullets and bullet fragments in his body, a taser probe in the left side of his chest, a broken fingernail, and some abrasions. Dr. Patterson testified that Hutson's cause of death was multiple gunshot wounds. Josh Easton, a crime scene investigator, testified that he discovered 9-millimeter caliber bullet casings at the scene of the crime. Timothy Johnson, a forensic scientist for the Illinois State Police, testified that the bullets and bullet fragments found in Hutson's body and the bullet casings found at the scene of the crime were all fired from the same firearm.

¶ 5        Video evidence and testimony from Kramer and one of her next-door neighbors, Patrick Childress, indicated that two men dressed in all dark clothing committed the crime. Video evidence showed two individuals dressed in dark clothing approaching the crime scene at approximately

2

10:19 p.m., prior to the incident. Video evidence also showed an individual exiting Kramer's home at approximately 11:46 p.m., followed shortly by two other individuals entering the frame and a couple flashes of light. Within the same minute, the video showed two individuals in dark clothing leaving the scene, one running and the other jogging with an altered gait.

¶ 6     Kramer testified that she walked Hutson to her door, then closed and locked the door behind him after he left. She testified that shortly thereafter, she heard Hutson say "hey" and thought he needed to come back into her home. She testified that she opened her door and saw two men dressed in dark clothing running across her yard; one of the men already had Hutson "off-balance," and the other turned and started towards her. She testified that she slammed and locked her door, ran to her bathroom, and locked herself in out of fear; she did not have her phone while locked in the bathroom. Childress testified he saw two men in all black clothing pass his front yard after what he later learned was the sound of gunshots. Childress testified that the first man who passed his yard was wearing a ski mask, but Childress could tell he was a black man because the man had nothing on his hands, and his hands were visible. Childress testified that the first man began by strolling by his yard, then jogged; the second man ran past the yard. Kramer and Mekisha McDougle, Kramer's other next-door neighbor, both testified to hearing multiple gunshots; neither person testified that they observed the shooting.

¶ 7     Linda Lovett testified that Larry Lovett, co-defendant and Linda Lovett's nephew, arrived at her house having been shot; she testified co-defendant was wearing a black sweatshirt and that defendant, who arrived with co-defendant, was wearing dark clothes. Co-defendant's ex-girlfriend, Amber Darden, testified that she allowed co-defendant to borrow her vehicle, a 2019 white Buick Encore, that night, and Marcus Bush—the individual defendant later implicated as the shooter to police in his interrogation—told her to retrieve her car around 11 p.m., and Bush gave her the keys.

3

Darden testified that Bush was wearing a red shirt when she saw him on the night of the incident. Surveillance video from Barnes-Jewish Hospital captured a white Buick SUV arriving at the emergency department at approximately 12:14 a.m. on December 8, 2021. The video showed a gunshot victim exiting the vehicle. Seth Richardson, a public safety officer for Barnes-Jewish Hospital that night, testified that the driver of the vehicle told the victim to get out of the vehicle; Richardson observed two other men in the vehicle, and discovered the gunshot victim's last name was Lovett.

¶ 8    Captain Brian Koberna of the Madison County Sheriff's Office, and Deputy Commander of the Major Case Squad, testified that he analyzed the data taken from Darden's vehicle. He testified that the data showed the vehicle left the area of Darden's residence at 8:08 p.m., arrived at the area of defendant's residence at 8:22 p.m., drove past the area where the crime occurred, and arrived in the area of Bush's residence at 8:57 p.m. He testified that the data also showed the vehicle arrived in the area of Lovett's residence at 9:01 p.m., left to drive to the area of Bush's residence at 10:18 p.m., and returned to the area of Lovett's residence at 10:32 p.m. He testified that the vehicle's data showed it was active again around 11:30 p.m., when it made a loop in the area of the incident and, "following the homicide" the vehicle traveled to Barnes-Jewish Hospital, then stopped at defendant's home around 12:48 a.m., before ultimately coming to rest outside of Bush's residence.

¶ 9    Exhibits showed that in the days leading up to the murder, cellular phone numbers belonging to defendant and co-defendant engaged in a text exchange discussing where to "strike," the need for "gloves," and doing "it" whether they had access to a car or not. Sergeant Detective James Witcher, of the Madison Police Department and a member of the Major Case Squad, testified that he saw black vinyl gloves on the ground around the corner of the crime scene. He

testified that he believed the gloves had some evidentiary value, and both he and Officer Howell, at the time a member of the Venice Police Department, testified that Officer Howell stayed with the gloves until a crime scene investigator arrived. Prior to the discovery of the gloves, Officer Howell was one of the first on the scene and testified that he observed a taser next to Hutson's body. In her testimony, Darden stated she had seen co-defendant with a taser before.

¶ 10    Jason Perkins, a crime scene investigator for the Illinois State Police, testified that he searched Darden's home and vehicle. He testified that he obtained a taser probe from the back seat of her vehicle. Darden testified that officers also obtained the phone belonging to co-defendant and black vinyl gloves from her home. James Riggins, a trace chemist and forensic scientist for the Illinois State Police, examined the two gloves found near the crime scene, and the three gloves found in Darden's home on her dresser. Riggins testified that, due to a lack of broken gloves or separated edges, a physical match of the two groupings of gloves was precluded. Riggins testified, however, that the gloves all had a similar, unique, glitter-like effect, and were the same color, dimensions, thickness, and material.

¶ 11    Jay Winters, a forensic scientist for biology and DNA for the Illinois State Police, analyzed the DNA in this case. He testified that, after analyzing the DNA discovered in the black vinyl gloves found near the crime scene and on the taser probe found in the back seat of Darden's vehicle, it was his opinion that the DNA belonged to defendant.

¶ 12    Captain Koberna interrogated defendant on December 14, 2021, and testified to some of the items investigators took photographs of and/or obtained from the search of defendant's home. He testified that investigators found dark articles of clothing in defendant's home. He also testified that investigators found a generic gun case containing a 9-millimeter Glock magazine; no firearm was found in defendant's home.

5

¶ 13    In his recorded interrogation with police, which was admitted into evidence and watched by the jury, defendant admitted to being with co-defendant on the night of the incident. He further admitted that he and co-defendant planned to rob Hutson but stated that he only drove the "getaway" vehicle because co-defendant asked him for "help." Defendant stated that Bush had a taser probe dangling from his chest, and that he saw Bush take the probe out and throw the probe out of the vehicle.

¶ 14    At points defendant stated he rode in the back seat, walked to the store, or needed to be picked up when co-defendant needed to go to the hospital. At other points defendant said he pulled up to the scene of the crime to pick up co-defendant and Bush, had the car with him the whole time, or became the driver after arriving at the hospital. Defendant stated that he has worn black latex gloves, but not on the night of the incident and not in a long time. He also stated that he does not own a firearm, that he had not been shot with a taser that night, and that he was not wearing black clothing that night. Following the State's case-in-chief, defendant indicated that he did not intend to testify after being properly admonished by the trial court.

¶ 15    In her opening statement, defense counsel questioned the reliability of the evidence and those that collected it and also asserted that the State would not be able to satisfy its burden. Defense counsel asserted that the State "cannot prove all" of its case, and that the jury would have questions "at every point along the way." Defense counsel stated that the officers involved in the case may "believe in what they're doing *** [b]ut that doesn't mean that absolutely everybody performed to the best of their ability *** [or] did everything they were supposed to do. There are mistakes made throughout this process." She criticized the officers for not "follow[ing] up in any great detail," and stated that the "emphasis [was] to get [the investigation] done as fast as possible" later stating that the officers had to have been "short on sleep." Defense counsel asserted that

6

evidence was mishandled "time and again," and that officers would "conveniently" find evidence that had previously gone unseen. She stated that the jury would not have the "full picture" and that the victim and the gloves "laid there a long time." Finally, shortly before concluding her opening statement, defense counsel asserted that those who worked on the case employed a "conclusory approach" and operated with "confirmation bias" regarding defendant's guilt.

¶ 16    Throughout the trial, defense counsel's questions followed what her opening statement foreshadowed, with many of the officers being questioned during cross-examination to establish that their work on the case lacked the requisite care or the necessary attention to detail. The defense rested without calling any witnesses or presenting evidence.

¶ 17    In the State's closing arguments, it reasserted its theory of the case, namely that defendant and co-defendant, dressed in all black and wearing gloves, waited in darkness armed with weapons. It argued that when Hutson left Kramer's home, they struck, attempting to rob Hutson at gunpoint. It argued that Hutson put up a fight and, despite being shot by one of the prongs of a taser, Hutson was able to take the firearm from defendant and shoot co-defendant. It argued that defendant was able to get his gun back after another struggle, and shot Hutson multiple times, and both assailants left Hutson to die in the driveway of Kramer's home.

¶ 18    Defense counsel's closing argument began with her stating, "This case is a mess." She asked, "Who's going to hold the police accountable for this incredibly sloppy investigation that they gave to you?" Defense counsel suggested that the investigation had been nefariously conducted, and that some of the DNA evidence had been placed near the scene, rather than found there. She told the jury that it did not "have all the evidence in this case." The trial court tendered the pattern jury instructions for accountability generally as well as for felony murder specifically and responsibility for the act of another when that other actor is not prosecuted to the jury after

7

closing. Despite the aforementioned instructions looming, defense counsel stated, "They cannot prove [defendant discharged a firearm that killed Andre Hutson] to you, and so now they're asking you to hold my client accountable for what someone else might have done, and you cannot do that. You cannot hold someone accountable for somebody's actions when you don't know what that person's actions are."

¶ 19    The trial court instructed the jury as to the law to be applied to the evidence. *Inter alia*, the trial court read the instructions for attempted armed robbery, first degree murder, and accountability generally (Illinois Pattern Jury Instructions, Criminal, No. 5.03 (eff. Jan. 1, 2010) (hereinafter IPI Criminal No. 5.03)), accountability in felony murder specifically (Illinois Pattern Jury Instructions, Criminal, No. 5.03A (approved Oct. 28, 2016) (hereinafter IPI Criminal No. 5.03A)), and accountability for the act of another when that other actor is not prosecuted (Illinois Pattern Jury Instructions, Criminal, No. 5.06 (approved Oct. 28, 2016) (hereinafter IPI Criminal No. 5.06)). The trial court instructed that a person commits first degree murder, "when he kills an individual if in performing the acts which caused the death he intends to kill or do great bodily harm to that individual, or he knows that such acts create a strong probability of death or great bodily harm to that individual, or he is committing the offense of Attempt Armed Robbery." The trial court instructed the jury that the State must prove two propositions to sustain the charge of first degree murder. First, "that the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of *** Hutson." Second, that when defendant, or one whose conduct he was legally responsible for, did so he "intended to kill or do great bodily harm to *** Hutson, or he knew that his acts created a strong probability of death or great bodily harm to *** Hutson, or he was committing the offense of Attempt Armed Robbery." The jury was given

8

a general verdict for all three counts of murder. The jury was asked to find defendant guilty or not guilty of first degree murder and attempted armed robbery.

¶ 20    The trial court also instructed the jury on IPI Criminal Nos. 5.03, 5.03A, and 5.06; all three instructions were given without an objection. Stated in the order listed, the trial court instructed that a person is legally responsible for the conduct of another when "either before or during the commission of the offense and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning or commission of the offense." The trial court also instructed that it is not necessary to find that defendant, or someone he was legally responsible for, originally intended to kill Hutson, and to sustain the charge of first degree murder it is "sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant, or one for whose conduct he is legally responsible, combined to do an unlawful act, such as to commit Attempt Armed Robbery, in that the deceased was killed by one of the parties committing the unlawful act." The trial court further instructed that a person can be found legally responsible for the conduct of another, and be convicted for the offense, "even though the other person who it is claimed committed the offense has not been prosecuted or has not been convicted."

¶ 21    Jury deliberations lasted approximately three hours. During deliberations, the jury asked three questions regarding whether a taser is a weapon, whether a taser is considered a firearm, and "If the gun belonged to the deceased could the defendant be charged with first degree murder armed with a firearm?" The trial court answered by defining what a "taser" is, explaining that a taser is not a firearm, and, responding to the last question, stating, "You have received all the evidence and instructions in this case."

9

¶ 22    On July 15, 2022, defendant was found guilty of first degree murder and attempted armed robbery. The jury also found that during the commission of the offense of first degree murder, defendant, or one for whose conduct he was legally responsible, was armed with a firearm.

¶ 23    On August 2, 2022, defendant's posttrial motion for a new trial was denied, and he was sentenced to 75 years in the Illinois Department of Corrections, 50 years for the murder, 10 years for the attempted robbery, and a 15-year firearm enhancement. Each sentence was mandated to be consecutive. Defendant filed a timely appeal on August 23, 2022.

¶ 24                                II. ANALYSIS

¶ 25    Defendant argues on appeal that his defense counsel was ineffective when she failed to request a separation of the verdict for first degree murder into three verdicts on the three theories of first degree murder he was charged under, those being intentional murder, knowing murder, and felony murder. Defendant asserts that, while there may not have been much in the way of a defense for felony murder as he had confessed to the underlying felony and did not dispute that a death resulted from the commission of the confessed felony, a conviction for intentional or knowing murder was not supported by the evidence. Defendant asserts that defense counsel's failure to request a partition of the verdict could not be considered trial strategy, and that prejudice results from the fact that defendant would not have been found guilty of intentional or knowing murder, thereby merging the underlying attempted armed robbery felony into felony murder, and resulting in a ten-year-shorter sentence. Defendant requests that his conviction and sentence for attempted armed robbery be vacated.

¶ 26    The State argues in response that defense counsel employed an "all-or-nothing" and/or jury nullification trial strategy, making this issue virtually immune to review for ineffective assistance. The State argues further that there is no reasonable probability that the trial court would have found

10

differently, where defendant could have been found guilty of intentional or knowing murder, just as he was found guilty of felony murder. As a tertiary issue, the State asserts that this claim is best resolved in a postconviction proceeding and not on appeal. For the following reasons, we find that defendant did not receive ineffective assistance of defense counsel and affirm the judgment of the trial court. We first address the State's claim that this issue is best left for a postconviction proceeding.

¶ 27                                        A. *Veach* Jurisprudence

¶ 28    The State asserts that the record here is insufficient to dispose of defendant's claim of ineffective assistance of defense counsel on the merits, and that a postconviction proceeding is the best avenue to develop the record. We disagree.

¶ 29    "[I]n Illinois, a defendant must generally raise a constitutional claim alleging ineffective assistance of [trial] counsel on direct review or risk forfeiting the claim." *People v. Veach*, 2017 IL 120649, ¶ 47. "[A]ny issues considered by the court on direct appeal are barred by the doctrine of *res judicata*, and issues which could have been considered on direct appeal are deemed procedurally defaulted." *People v. Ligon*, 239 Ill. 2d 94, 103 (2010). It is not the function of a postconviction proceeding to consider claims "which could have been presented on the direct review of the conviction." *People v. Thomas*, 38 Ill. 2d 321, 323 (1967). "Procedural default does not, however, preclude a defendant from raising an issue on collateral review that depended upon facts not found in the record." *Veach*, 2017 IL 120649, ¶ 47.

¶ 30    In *Veach*, the supreme court reviewed a case in which the Fourth District Appellate Court declined to review an ineffective assistance of counsel argument based on the assertion that the issue was best pursued through postconviction proceedings. *Veach*, 2017 IL 120649, ¶ 25. The Fourth District reasoned that, "The record contain[ed] no indication whatsoever why defense

11

counsel agreed to the admission of the video recordings in question [and t]o resolve defendant's claim, this court would need to guess at [trial] counsel's motivation." (Internal quotation marks omitted.) *Id.* ¶ 35. In overruling the Fourth District, the supreme court stated, "In our view, ineffective assistance of trial counsel claims may *sometimes* be better suited to collateral proceedings but *only* when the record is incomplete or inadequate for resolving the claim. The reason is that in Illinois, *defendants are required to raise ineffective assistance of trial counsel claims on direct review if apparent on the record*." (Emphases added.) *Id.* ¶ 46. The Court stated, "reviewing courts in Illinois should carefully consider each ineffective assistance of [trial] counsel claim on a case-by-case basis." *Id.* ¶ 48. The Court subsequently determined that the record in *Veach* was sufficient to resolve defendant's ineffective assistance of defense counsel claim. *Id.* ¶ 50.

¶ 31    In making its argument, the State relies on the cases of *People v. Durgan*, 346 Ill. App. 3d 1121 (2004), *People v. Logan*, 2011 IL App (1st) 093582, and *People v. Parker*, 344 Ill. App. 3d 728 (2003). We first must note that *Durgan* was abrogated by our supreme court in *Veach* because it improperly relied on *People v. Kunze*, 193 Ill. App. 3d 708 (1990), which "did not cite any authority to support its holding that ineffective assistance of trial counsel claims are better made in postconviction proceedings." *Veach*, 2017 IL 120649, ¶ 39. The State's reliance on *Durgan* is unfounded.

¶ 32    The State's reliance on *Logan* and *Parker* is misplaced. *Logan* is distinguishable from the case at bar, where the claims of ineffective assistance of defense counsel were presented in a posttrial motion, on direct appeal, in postconviction proceedings, and then in a second appeal regarding the postconviction proceedings. *Logan*, 2011 IL App (1st) 093582, ¶¶ 15, 18-19, 29, 56. Undoubtedly, multiple proceedings and appeals will lead to a more comprehensive record. *Logan*,

12

however, does not stand for the assertion that a defendant *must* pursue postconviction proceedings as a matter of course, nor does the State argue as such, providing in its brief, "The *Logan* decision illustrates the importance of a developed record where a defendant claims ineffective assistance of trial counsel." This illustration from *Logan* does not mandate defendant pursue a claim of ineffective assistance of counsel through postconviction proceedings prior to a direct appeal here.

¶ 33    Further, the decision in *Parker* appears to rely in part on the *Kunze* progeny case, *People v. Morris*, 229 Ill. App. 3d 144 (1992), in making its decision not to review the ineffective assistance claim for want of a more complete record. *Parker*, however, did not apply the "broad-sweeping 'categorical approach' " the *Veach* Court took issue with from *Kunze*, and did indeed review the case, finding that that specific record was insufficient to determine the issue of ineffective assistance. *Parker*, 344 Ill. App. 3d at 736-37.

¶ 34    Here, as our supreme court outlined in *Veach*, we shall not utilize the broad-sweeping categorical approach the State seeks us to employ in finding that this case is best placed in a postconviction proceeding. We indeed find the opposite, that the record is sufficient to resolve the issue of ineffective assistance of defense counsel. As discussed below, we find that defense counsel's strategy can be gleaned from the record before us, based on her opening statement, her questions in cross-examinations, and her closing argument. Therefore, following *Veach* and applying a case-by-case analysis, we find the record here sufficient to resolve the issue of ineffective assistance of defense counsel.

¶ 35                    B. Ineffective Assistance of Counsel

¶ 36    Next we consider the primary issue of ineffective assistance of defense counsel. Defendant asserts defense counsel was ineffective for failing to request a partition of the first degree murder verdict and that, if defense counsel had done so, he would have only been found guilty on the basis

13

of felony murder, and the underlying felony would have merged into the murder conviction, thereby reducing his sentence by 10 years. We find that defense counsel not seeking a partition of the first degree murder verdict was a matter of trial strategy. Further, even assuming, *arguendo*, we were to take as true defendant's argument that defense counsel's assistance fell below the objective standard of reasonableness, we find that defendant cannot show prejudice under the second prong of *Strickland*, where there was ample evidence to convict defendant on any of the three theories of first degree murder.

¶ 37    The analysis for ineffective assistance of counsel is two-prong. First, "defendant must show that trial counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Second, "[d]efendant must show that there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "To prevail, [d]efendant must satisfy both prongs of the *Strickland* test. [Citation.] The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of [trial] counsel." *People v. Yankaway*, 2025 IL 130207, ¶ 62.

¶ 38                          1. Objective Standard of Reasonableness

¶ 39    "The benchmark for judging any claim of ineffectiveness must be whether [trial] counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. "When a convicted defendant complains of the ineffectiveness of [trial] counsel's assistance, defendant must show that trial counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. "[T]he performance inquiry must be whether [trial] counsel's assistance was reasonable considering the circumstances." *Id.* at 688. When reviewing defense counsel's performance, we

14

must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of [trial] counsel's challenged conduct, and to evaluate the conduct from [trial] counsel's perspective at the time." *Id.* at 689. "[A] court must indulge a strong presumption that [trial] counsel's conduct falls within the wide range of reasonable professional assistance; that is, defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Id.* "Matters of trial strategy are generally immune from claims of ineffective assistance of [trial] counsel." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327 (2011).

¶ 40 Ineffective assistance of defense counsel "requires a bifurcated standard of review, wherein a reviewing court must defer to the trial court's findings of fact unless they are against the manifest weight of the evidence but must make a *de novo* assessment of the ultimate legal issue of whether trial counsel's omission supports an ineffective assistance claim." *People v. Berrier*, 362 Ill. App. 3d 1153, 1166-67 (2006). Where the facts surrounding the claim are undisputed, the review is *de novo*. *Id.* at 1167.

¶ 41 Before any analysis on the first prong of *Strickland*, we briefly acknowledge defendant's and the State's citation to *People v. Smith*, 233 Ill. 2d 1 (2009). In *Smith*, our supreme court found that a trial court abused its discretion when it denied the defendant's request for specific verdict forms where the offenses charged could have resulted in different sentencing consequences. *Smith*, 233 Ill. 2d at 23. As is acknowledged in both briefs, since it was decided, reviewing courts have consistently refused to apply *Smith* to cases that did not involve a circuit court's refusal of a defense request to separate verdict forms. See *People v. Wilson*, 2017 IL App (1st) 143183; *People v. Hill*, 2014 IL App (2d) 120506; *People v. Calhoun*, 404 Ill. App. 3d 362 (2010); *People v. Mabry*, 398 Ill. App. 3d 745 (2010); *People v. Braboy*, 393 Ill. App. 3d 100 (2009). For example, in *Braboy*

the Court held that *Smith* could not support a claim of ineffective assistance of defense counsel, reasoning that *Smith* is "limited to situations in which the trial court actually denied a request for separate verdict forms." *Braboy*, 393 Ill. App. 3d at 108. Defendant offers no compelling reason for us to decline to follow *Wilson*, *Hill*, *Calhoun*, *Mabry*, and *Braboy*. Accordingly, we too hold that *Smith* is "limited to situations in which the trial court actually denied a request for separate verdict forms," and does not support a claim of ineffective assistance of defense counsel. *Id.*

¶ 42    In addressing defense counsel's effectiveness, the State argues, *inter alia*, that defense counsel's trial strategy was to argue jury nullification. Defense counsel's trial argument is best summed in three parts: (1) the evidence was untrustworthy and unreliable; (2) the gatherers and presenters of the evidence (*i.e.* the officers and the State) were untrustworthy and unreliable; and (3) that defendant could not be found guilty for a crime he did not personally commit. The latter argument is the jury nullification argument.

¶ 43    "[C]ounsel may not argue that jurors should ignore the law in coming to a decision, he may [however] present a defense evoking the 'empathy, compassion or understanding and sympathy' of the jurors." *People v. Gilbert*, 2013 IL App (1st) 103055, ¶ 28 (quoting *People v. Ganus*, 148 Ill. 2d 466, 473-74 (1992)). Where the defendant has no defense and the evidence is overwhelming, "[j]ury nullification is always a possibility." *Ganus*, 148 Ill. 2d at 473. "[W]hen the circumstances of the case render other defensive strategies unavailable," arguing jury nullification is a "reasonable trial strategy." (Internal quotation marks omitted.) *Gilbert*, 2013 IL App (1st) 103055, ¶ 28. The case at bar is one such example.[1] Despite the jury instructions that were given without

---

[1]We note that the State also asserts that defense counsel was engaged in an "all-or-nothing" trial strategy. Following this Court's precedent in *People v. Lemke*, 349 Ill. App. 3d 391 (2004), we note that said trial strategy *alone* would not be considered a valid trial strategy, because said strategy would be based on a misapprehension of the law. *Lemke*, 349 Ill. App. 3d at 399; see *People v. Walton*, 378 Ill. App. 3d 580, 589 (2007).

16

objection, IPI Criminal Nos. 5.03, 5.03A, and 5.06, concerning accountability, accountability for felony murder, and accountability for the act of another when that other actor is not prosecuted respectively, defense counsel still argued in her closing arguments that the jury could not "hold someone accountable for somebody's actions when you don't know what that other person's actions are." Given the context that defendant admitted to the underlying felony, and the jury was moments away from being instructed that they could indeed hold defendant accountable for another person's actions, defense counsel was making an appeal to the jury's moral sense of right and wrong, and hoping the jury would ignore the binding law. In the context of overwhelming evidence and a lack of any other viable defensive strategies, we find jury nullification a reasonable trial strategy here. *Gilbert*, 2013 IL App (1st) 103055, ¶ 28. Therefore, we find that defense counsel's representation did not fall below an objective standard of reasonableness.

¶ 44                                    2. Prejudice

¶ 45     Further, even assuming, *arguendo*, that this court takes as true the argument that defense counsel's assistance fell below an objective standard of reasonableness, prejudice could not have resulted from defense counsel's unreasonable assistance. "An error by trial counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment *** Accordingly, any deficiencies in trial counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 691-92. "Defendant must show that there is a reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695.

¶ 46    Here, defendant's entire argument is predicated on the assertion that he would not have been found guilty of intentional or knowing murder, pursuant to the first degree murder statutes 720 ILCS 5/9-1(a)(1), (2) (West 2020). For intentional murder, "[a] person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death he or she either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." *Id.* § 9-1(a)(1). For knowing murder, "[a] person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death he or she knows that such acts create a strong probability of death or great bodily harm to that individual or another." *Id.* § 9-1(a)(2).

¶ 47    The myriad of incriminating evidence suggests that defendant committed a knowing murder, pursuant to section 9-1(a)(2) of the Criminal Code of 2012 (*id.*), at a minimum. Communication between cell phone numbers belonging to defendant and co-defendant established their intent to commit a robbery, and the need for gloves to help conceal their identities; gloves containing defendant's DNA were found near the crime scene. Two men dressed in all dark clothing were seen entering and exiting the crime scene; defendant was seen in all dark clothing shortly after the shooting. Co-defendant was seen with a taser; one taser probe was found at the crime scene, and the other was found in the back seat of the car used in the crime with defendant's DNA. A firearm that fired 9-millimeter rounds was used in the murder of Hutson; a gun case with a 9-millimeter Glock magazine but a missing firearm was found at defendant's residence. Despite the information defendant provided in his recorded interrogation, a finding of his guilt under either of the two remaining theories of first degree murder is supported by the evidence, and a rational trier of fact could have found so beyond a reasonable doubt.

¶ 48　Defendant stated in his interrogation that he was not on the scene and was only ever in the vehicle, yet his DNA was on one of the taser probes shot as a pair during the commission of the crime. He stated he was not on the scene and that he had not worn black gloves in a long time, yet his DNA was found in the black gloves near the crime scene. Defendant said he was not wearing dark clothes that night, yet there was testimony that he was in dark clothing that night. Defendant stated he did not own a firearm, despite a gun case and 9-millimeter Glock magazine being found in his home. Further, defendant's description of his involvement in the crime is not only inconsistent, but it is also unsupported by the location data taken from the vehicle used in the crime. The evidence supports a finding of guilt beyond a reasonable doubt of knowing first degree murder at a minimum, where a jury could reasonably find that defendant killed Hutson knowing that shooting Hutson multiple times created the strong probability of his death or great bodily harm to Hutson. Therefore, we find that, considering the totality of the evidence, defendant cannot establish the second prong of *Strickland*, as the evidence supports a finding of guilt under any of the three theories of first degree murder.

¶ 49　　　　　　　　　　　III. CONCLUSION

¶ 50　Therefore, we affirm defendant's convictions and resulting 75-year sentence where defense counsel did not provide ineffective assistance when she did not seek separate verdicts on the three theories of first degree murder.

¶ 51　Affirmed.